KLOPFER *v.* NORTH CAROLINA.

No. 100.   Argued December 8, 1966.—Decided March 13, 1967.

*Wade H. Penny, Jr.,* argued the cause and filed a brief for petitioner.

*Andrew A. Vanore, Jr.,* argued the cause for respondent. With him on the brief were *T. W. Bruton,* Attorney General of North Carolina, and *Ralph Moody,* Deputy Attorney General.

*William W. Van Alstyne* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union et al., as *amici curiae.*

214

Mr. Chief Justice Warren delivered the opinion of the Court.

The question involved in this case is whether a State may indefinitely postpone prosecution on an indictment without stated justification over the objection of an accused who has been discharged from custody. It is presented in the context of an application of an unusual North Carolina criminal procedural device known as the *"nolle prosequi* with leave."

Under North Carolina criminal procedure, when the prosecuting attorney of a county, denominated the solicitor, determines that he does not desire to proceed further with a prosecution, he may take a *nolle prosequi*, thereby declaring "that he will not, at that time, prosecute the suit further. Its effect is to put the defendant without day, that is, he is discharged and permitted to go whithersoever he will, without entering into a recognizance to appear at any other time." *Wilkinson* v. *Wilkinson*, 159 N. C. 265, 266–267, 74 S. E. 740, 741 (1912). But the taking of the *nolle prosequi* does not permanently terminate proceedings on the indictment. On the contrary, "When a *nolle prosequi* is entered, the case may be restored to the trial docket when ordered by the judge upon the solicitor's application." *State* v. *Klopfer*, 266 N. C. 349, 350, 145 S. E. 2d 909, 910 (1966). And if the solicitor petitions the court to *nolle prosequi* the case "with leave," the consent required to reinstate the prosecution at a future date is implied in the order "and the solicitor (without further order) may have the case restored for trial." *Ibid.* Since the indictment is not discharged by either a *nolle prosequi* or a *nolle prosequi* with leave, the statute of limitations remains tolled. *State* v. *Williams*, 151 N. C. 660, 65 S. E. 908 (1909).

Although entry of a *nolle prosequi* is said to be "usually and properly left to the discretion of the Solicitor," *State v. Moody*, 69 N. C. 529, 531 (1873), early decisions indicate that the State was once aware that the trial judge would have to exercise control over the procedure to prevent oppression of defendants. See *State v. Smith*, 129 N. C. 546, 40 S. E. 1 (1901); *State v. Thornton*, 35 N. C. 256 (1852). But, in the present case, neither the court below nor the solicitor offers any reason why the case of petitioner should have been *nolle prossed* except for the suggestion of the Supreme Court that the solicitor, having tried the defendant once and having obtained only a mistrial, "may have concluded that another go at it would not be worth the time and expense of another effort." 266 N. C., at 350, 145 S. E. 2d, at 910. In his brief in this Court, the Attorney General quotes this language from the opinion below in support of the judgment.

Whether this procedure is presently sustained by the North Carolina courts under a statute or under their conception of the common-law procedure is not indicated by the opinion of the court, the transcript or the briefs of the parties in the present case. The only statutory reference to a *nolle prosequi* is in § 15–175, General Statutes of North Carolina,[1] which on its face does not apply to the facts of this case. Perhaps the procedure's

---

[1] N. C. Gen. Stat. § 15–175 (1965):

"A nolle prosequi 'with leave' shall be entered in all criminal actions in which the indictment has been pending for two terms of court and the defendant has not been apprehended and in which a nolle prosequi has not been entered, unless the judge for good cause shown shall order otherwise. The clerk of the superior court shall issue a capias for the arrest of any defendant named in any criminal action in which a nolle prosequi has been entered when he has reasonable ground for believing that such defendant may be arrested or upon the application of the solicitor of the

genesis lies in early nineteenth century decisions of the State's Supreme Court approving the use of a *nolle prosequi* with leave to reinstate the indictment, although those early applications of the procedure were quite different from those of the period following enactment of § 15–175. Compare *State* v. *Thompson,* 10 N. C. 613 (1825), and *State* v. *Thornton,* 35 N. C. 256 (1852) (capias issued immediately after entry of the *nolle prosequi* with leave), with *State* v. *Smith,* 170 N. C. 742, 87 S. E. 98 (1915) (capias issued eight years after a *nolle prosequi* with leave was taken, even though the defendant had been available for trial in 1907).

The consequence of this extraordinary criminal procedure is made apparent by the case before the Court. A defendant indicted for a misdemeanor may be denied an opportunity to exonerate himself in the discretion of the solicitor and held subject to trial, over his objection, throughout the unlimited period in which the solicitor may restore the case to the calendar. During that period, there is no means by which he can obtain a dismissal or have the case restored to the calendar for trial.[2] In spite of this result, both the Supreme Court and the Attorney General state as a fact, and rely upon it for affirmance in this case, that this procedure as applied to the petitioner placed no limitations upon him, and was in no way violative of his rights. With this we cannot agree.

This procedure was applied to the petitioner in the following circumstances:

---

district. When any defendant shall be arrested it shall be the duty of the clerk to issue a subpoena for the witnesses for the State indorsed on the indictment."

The provision was originally enacted in 1905.

[2] On oral argument, counsel for the State informed the Court that a North Carolina indictment could be quashed only if it contained a vitiating defect. See also N. C. Gen. Stat. §§ 15–153, 15–155 (1965).

On February 24, 1964, petitioner was indicted by the grand jury of Orange County for the crime of criminal trespass, a misdemeanor punishable by fine and imprisonment in an amount and duration determined by the court in the exercise of its discretion.[3]   The bill charged that he entered a restaurant on January 3, 1964, and, "after being ordered . . . to leave the said premises, wilfully and unlawfully refused to do so, knowing or having reason to know that he . . . had no license therefor . . . ." Prosecution on the indictment began with admirable promptness during the March 1964 Special Criminal Session of the Superior Court of Orange County; but, when the jury failed to reach a verdict, the trial judge declared a mistrial and ordered the case continued for the term.

Several weeks prior to the April 1965 Criminal Session of the Superior Court, the State's solicitor informed petitioner of his intention to have a *nolle prosequi* with leave entered in the case.   During the session, petitioner, through his attorney, opposed the entry of such an order in open court.   The trespass charge, he contended, was abated by the Civil Rights Act of 1964 as construed in *Hamm* v. *City of Rock Hill*, 379 U. S. 306 (1964).   In spite of petitioner's opposition, the court indicated that it would approve entry of a *nolle prosequi* with leave if requested to do so by the solicitor.   But the solicitor

_____

[3] N. C. Gen. Stat. § 14–134 (Supp. 1965).   Although not expressly limited by statute, the extent of punishment is limited by N. C. Const. 1868, Art. I, § 14 ("Excessive bail should not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted").   See *State* v. *Driver*, 78 N. C. 423 (1878).   Decisions of the state courts indicate that imprisonment for up to two years would not be an "unusual punishment."   See, *e. g., State* v. *Farrington*, 141 N. C. 844, 53 S. E. 954 (1906).   The constitutional limitation upon the amount of the fine has not been judicially determined.

declined to make a motion for a *nolle prosequi* with leave. Instead, he filed a motion with the court to continue the case for yet another term, which motion was granted.

The calendar for the August 1965 Criminal Session of the court did not list Klopfer's case for trial. To ascertain the status of his case, petitioner filed a motion expressing his desire to have the charge pending against him "permanently concluded in accordance with the applicable laws of the State of North Carolina and of the United States as soon as is reasonably possible." Noting that some 18 months had elapsed since the indictment, petitioner, a professor of zoology at Duke University, contended that the pendency of the indictment greatly interfered with his professional activities and with his travel here and abroad. "Wherefore," the motion concluded, "the defendant . . . petitions the Court that the Court in the exercise of its general supervisory jurisdiction inquire into the trial status of the charge pending against the defendant and . . . ascertain the intention of the State in regard to the trial of said charge and as to when the defendant will be brought to trial."

In response to the motion, the trial judge considered the status of petitioner's case in open court on Monday, August 9, 1965, at which time the solicitor moved the court that the State be permitted to take a *nolle prosequi* with leave. Even though no justification for the proposed entry was offered by the State, and, in spite of petitioner's objection to the order, the court granted the State's motion.

On appeal to the Supreme Court of North Carolina, petitioner contended that the entry of the *nolle prosequi* with leave order deprived him of his right to a speedy trial as required by the Fourteenth Amendment to the United States Constitution. Although the Supreme.

Court acknowledged that entry of the *nolle prosequi* with leave did not permanently discharge the indictment, it nevertheless affirmed. Its opinion concludes:

> "Without question a defendant has the right to a speedy trial, if there is to be a trial. However, we do not understand the defendant has the right to compel the State to prosecute him if the state's prosecutor, in his discretion and with the court's approval, elects to take a *nolle prosequi*. In this case one jury seems to have been unable to agree. The solicitor may have concluded that another go at it would not be worth the time and expense of another effort.

> "In this case the solicitor and the court, in entering the *nolle prosequi* with leave followed the customary procedure in such cases. Their discretion is not reviewable under the facts disclosed by this record. The order is affirmed." 266 N. C., at 350–351, 145 S. E. 2d, at 910.

The North Carolina Supreme Court's conclusion—that the right to a speedy trial does not afford affirmative protection against an unjustified postponement of trial for an accused discharged from custody—has been explicitly rejected by every other state court which has considered the question.[4] That conclusion has also been

---

[4] See *Rost* v. *Municipal Court of Southern Judicial District*, 184 Cal. App. 2d 507, 7 Cal. Rptr. 869 (1st Dist. 1960); *Kistler* v. *State*, 64 Ind. 371 (1879); *Jones* v. *Commonwealth*, 114 Ky. 599, 71 S. W. 643 (1903); *Barrett* v. *State*, 155 Md. 636, 142 A. 96 (1928); *Hicks* v. *Recorder's Court of Detroit*, 236 Mich. 689, 211 N. W. 35 (1926); *State* v. *Artz*, 154 Minn. 290, 191 N. W. 605 (1923).

See also *Jacobson* v. *Winter*, 91 Idaho 11, 415 P. 2d 297 (1966); *People* v. *Bryarly*, 23 Ill. 2d 313, 178 N. E. 2d 326 (1961); *People* v. *Prosser*, 309 N. Y. 353, 130 N. E. 2d 891 (1955); *State* v. *Couture*, 156 Me. 231, 163 A. 2d 646 (1960); *State* v. *Keefe*, 17 Wyo. 227, 98 P. 122 (1908) (the right to a speedy trial may be violated by

implicitly rejected by the numerous courts which have held that a *nolle prossed* indictment may not be reinstated at a subsequent term.[5]

undue delay in bringing a prisoner confined within the State to trial, even though he is not held in custody under the indictment).

Dicta in decisions of the Colorado, Iowa, and Utah courts clearly indicate that these States would also hold that the speedy trial right would protect a defendant in petitioner's position: see *In re Miller*, 66 Colo. 261, 263–264, 180 P. 749, 750–751 (1919); *Pines* v. *District Court of Woodbury County*, 233 Iowa 1284, 1294, 10 N. W. 2d 574, 580 (1943); *State* v. *Mathis*, 7 Utah 2d 100, 103, 319 P. 2d 134, 136 (1957).

Although Pennsylvania has not decided the question presented by this case, decisions of its Supreme Court indicate that the "right to a speedy trial" is only applicable to a man held in prison. See *Commonwealth- ex rel. Smith* v. *Patterson*, 409 Pa. 500, 187 A. 2d 278 (1963). But in that case, the Commonwealth's Supreme Court held that the delay in trying the defendant and the failure to give him notice of the pendency of a complaint for eight years constituted a denial of due process. Moreover, Rule 316 of the Commonwealth's rules of criminal procedure authorizes the court to dismiss a case which has not been brought to trial within a "reasonable time."

By rule or legislation in 17 States, any defendant, whether at large or in custody, whose trial has been unduly delayed is entitled to a dismissal. See Ariz. Rule Crim. Proc. 236; Cal. Pen. Code § 1382; Ga. Code Ann. § 27–1901 (1953); Idaho Code Ann. § 19–3501 (1948); Iowa Code § 795.2 (Supp. 1966); La. Rev. Stat. §§ 15:7.8–15:7.11 (Supp. 1962); Me. Rev. Stat. Ann., Tit. 15, § 1201 (1964); Mont. Rev. Codes Ann. § 94–9501 (1947); Nev. Rev. Stat. § 178.495; N. J. Rev. Rule Crim. Proc. 3:11–3 (Supp. 1966); N. D. Cent. Code § 29–18–01 (1960); Okla. Stat., Tit. 22, § 812 (1951); Ore. Rev. Stat. § 134.120; S. D. Code § 34.2203 (Supp. 1960); Utah Code Ann. § 77–51–1 (1953); Wash. Rev. Code § 10.46.010; W. Va. Code Ann. § 6210 (1961).

[5] Thirty States continue to permit a prosecuting official to enter a *nolle prosequi*. Legislation or court decisions in 13 of these proscribe reinstatement of the indictment at a subsequent term. See *Lawson* v. *People*, 63 Colo. 270, 165 P. 771 (1917); *Price* v. *Cobb*, 60 Ga. App. 59, 61, 3 S. E. 2d 131, 133 (1939), (by implication); *Jones* v. *Newell*, 117 So. 2d 752 (D. C. App. Fla., 2d Dist., 1960); *State* v. *Wong*, 47 Haw. 361, 389 P. 2d 439 (1964); *People* v.

We, too, believe that the position taken by the court below was erroneous.. The petitioner is not relieved of the limitations placed upon his liberty by this prosecution merely because its suspension permits him

*Watson,* 394 Ill. 177, 68 N. E. 2d 265 (1946), cert. denied, 329 U. S. 769; La. Rev. Stat. § 15:328 (1950); *Barrett* v. *State,* 155 Md. 636, 142 A. 96 (1928); *State* v. *Montgomery,* 276 S. W. 2d 166 (Mo. 1955); *In re Golib,* 99 Ohio App. 88, 130 N. E. 2d 855 (1955); *State ex rel. Hobbs* v. *Murrell,* 170 Tenn. 152, 93 S. W. 2d 628 (1936); *Ex parte Isbell,* 48 Tex. Cr. R. 252, 87 S. W. 145 (1905); *Dudley* v. *State,* 55 W. Va. 472, 47 S. E. 285 (1904); *Woodworth* v. *Mills,* 61 Wis. 44, 20 N. W. 728 (1884).

Alabama permits reinstatement of an indictment *nolle prossed* with leave, but only if the defendant cannot be brought before the court. See Ala. Code, Tit. 15, § 251 (Supp. 1965). Thus this procedure is similar to that of filing away the indictment, discussed below.

Of the remaining States, only North Carolina and Pennsylvania have held that a *nolle prossed* indictment could be reinstated at a subsequent term. See *Commonwealth* v. *McLaughlin,* 293 Pa. 218, 142 A. 213 (1928).

Several States permit the removal of the indictment from the trial docket with leave to reinstate at some indefinite future date. But in each, use of the procedure has been limited to situations in which the defendant cannot be brought before the court or where he has consented to the removal. See, *e. g., People* v. *Fewkes,* 214 Cal. 142, 4 P. 2d 538 (1931); *State* v. *Dix,* 18 Ind. App. 472, 48 N. E. 261 (1897); *Lifshutz* v. *State,* 236 Md. 428, 204 A. 2d 541 (1964), cert. denied, 380 U. S. 953; *Commonwealth* v. *Dowdican's Bail,* 115 Mass. 133 (1874) (indictment may be filed away only after verdict and then only with the consent of the accused); *Gordon* v. *State,* 127 Miss. 396, 90 So. 95 (1921) (consent of defendant necessary); *Rush* v. *State,* 254 Miss. 641, 182 So. 2d 214 (1966) (but not if defendant was in a mental institution at the time the indictment was retired to the files). At one time, Illinois decisions indicated that when an accused was imprisoned within the State on another charge an indictment might be filed away without his consent. See, *e. g., People* v. *Kidd,* 357 Ill. 133, 191 N. E. 244 (1934). But these decisions have since been overruled. See *People* v. *Bryarly,* 23 Ill. 2d 313, 178 N. E. 2d 326 (1961).

to go "whithersoever he will." The pendency of the indictment may subject him to public scorn and deprive him of employment, and almost certainly will force curtailment of his speech, associations and participation in unpopular causes. By indefinitely prolonging this oppression, as well as the "anxiety and concern accompanying public accusation,"[6] the criminal procedure condoned in this case by the Supreme Court of North Carolina clearly denies the petitioner the right to a speedy trial which we hold is guaranteed to him by the Sixth Amendment of the Constitution of the United States.

While there has been a difference of opinion as to what provisions of this Amendment to the Constitution apply to the States through the Fourteenth Amendment, that question has been settled as to some of them in the recent cases of *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), and *Pointer* v. *Texas,* 380 U. S. 400 (1965). In the latter case, which dealt with the confrontation-of-witnesses provision, we said:

> "In the light of *Gideon, Malloy,* and other cases cited in those opinions holding various provisions of the Bill of Rights applicable to the States by virtue of the Fourteenth Amendment, the statements made in *West* and similar cases generally declaring that the Sixth Amendment does not apply to the States can no longer be regarded as the law. We hold that petitioner was entitled to be tried in accordance with the protection of the confrontation guarantee of the Sixth Amendment, and that that guarantee, like the right against compelled self-incrimination, is 'to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal

---

[6] *United States* v. *Ewell,* 383 U. S. 116, 120 (1966).

rights against federal encroachment.' *Malloy* v. *Hogan, supra,* 378 U. S., at 10." [7]

We hold here that the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment. That right has its roots at the very foundation of our English law heritage. Its first articulation in modern jurisprudence appears to have been made in Magna Carta (1215), wherein it was written, "We will sell to no man, we will not deny or defer to any man either justice or right"; [8] but evidence of recognition of the right to speedy justice in even earlier times is found in the Assize of Clarendon (1166).[9] By the late thirteenth century, justices, armed with commissions of gaol delivery and/or oyer and terminer [10] were visiting the

[7] 380 U. S., at 406.

[8] Magna Carta, c. 29 [c. 40 of King John's Charter of 1215] (1225), translated and quoted in Coke, The Second Part of the Institutes of the Laws of England 45 (Brooke, 5th ed., 1797).

[9] "4. And when a robber or murderer or thief or receiver of them has been arrested through the aforesaid oath, if the justices are not about to come speedily enough into the country where they have been taken, let the sheriffs send word to the nearest justice by some well-informed person that they have arrested such men, and the justices shall send back word to the sheriffs informing them where they desire the men to be brought before them; and let the sheriffs bring them before the justices." 2 English Historical Documents 408 (1953).

[10] An example of the Commission of gaol delivery is set forth in Goebel, Cases and Materials on the Development of Legal Institutions 53 (7th rev. 1946):

"The lord king to his beloved and faithful Stephen de Segrave and William Fitz Warin, greeting. Know that we have appointed you justices to deliver our gaol at Gloucester, in accordance with the custom of our realm, of the prisoners arrested and held there. And hence we order you that in company with the coroners of the county of Gloucester you convene at Gloucester on the morrow of the festival of the Holy Trinity in the twelfth year of our reign [Monday, May 22, 1228], to deliver the aforementioned gaol, as

countryside three times a year.[11] These justices, Sir
Edward Coke wrote in Part II of his Institutes, "have
not suffered the prisoner to be long detained, but at their
next coming have given the prisoner full and speedy
justice, . . . without detaining him long in prison." [12]
To Coke, prolonged detention without trial would have
been contrary to the law and custom of England; [13] but
he also believed that the delay in trial, by itself, would be
an improper denial of justice. In his explication of
Chapter 29 of the Magna Carta, he wrote that the words
"We will sell to no man, we will not deny or defer to any
man either justice or right" had the following effect:

> "And therefore, every subject of this realme, for
> injury done to him *in bonis, terris, vel persona,* by
> any other subject, be he ecclesiasticall, or temporall,
> free, or bond, man, or woman, old, or young, or be
> he outlawed, excommunicated, or any other without
> exception, may take his remedy by the course of the
> law, and have justice, and right for the injury done
> to him, freely without sale, fully without any
> deniall, and speedily without delay." [14]

aforesaid, for we have ordered our sheriff of Gloucestershire that at
the aforesaid time and place he cause to come before you all the
prisoners in the aforesaid gaol and all persons attached to appear
against them and on account of them. In witness whereof, etc.
Dated April 20, in the twelfth year of our reign."

"The judges commissioned in a general oyer and terminer com-
mission," Professor Goebel writes, "are ordered to inquire by grand
jury of named crimes, from treasons to the pettiest offence, as to
all particulars and to hear and determine these according to the
law and custom of the realm." *Id.,* at 54.

[11] *Id.,* at 54.

[12] Coke, *op. cit. supra,* n. 8, at 43.

[13] See *Ibid.*

[14] *Id.,* at 55. "Hereby it appeareth," Coke stated in the next
paragraph, "that justice must have three qualities, it must be *libera,
quia nihil iniquius venali justitia; plena, quia justitia non debet*

Coke's Institutes were read in the American Colonies by virtually every student of the law.[15] Indeed, Thomas Jefferson wrote that at the time he studied law (1762–1767), *"Coke Lyttleton* was the universal elementary book of law students."[16] And to John Rutledge of South Carolina, the Institutes seemed "to be almost the foundation of our law."[17] To Coke, in turn, Magna Carta was one of the fundamental bases of English liberty.[18] Thus, it is not surprising that when George Mason drafted the first of the colonial bills of rights,[19] he set forth a principle of Magna Carta, using phraseology similar to that of Coke's explication: "[I]n all capital or criminal prosecutions," the Virginia Declaration of Rights of 1776 provided, "a man hath a right . . . to a speedy trial . . . ."[20] That this right was considered fundamental at this early period in our history is evidenced by its guarantee in the constitutions of several of the States of the new nation,[21]

---

*claudicare; et celeris, quia dilatio est quaedam negatio;* and then it is both justice and right." Later in the explication of Chapter 29, Coke wrote that in conformity with the promise not to delay justice, all of the King's "commissions of oier, and terminer, of goale delivery, of the peace, &c. have this clause, *facturi quod ad justitiam pertinet, secundum legem,* and *consuetudinem Angliae,* that is, to doe justice and right, according to the rule of the law and custome of England . . . ."

[15] See Warren, History of the American Bar 157–187 (1911); Meador, Habeas Corpus and Magna Carta 23–24 (1966).

[16] Quoted in Warren, *op. cit. supra,* n. 15, at 174.

[17] Quoted in Bowen, The Lion and the Throne 514 (1956).

[18] See Coke, *op. cit. supra,* n. 8, at A4 (Proeme).

[19] See 1 Rowland, The Life of George Mason 234–266 (1892).

[20] See Va. Declaration of Rights, 1776, § 8.

[21] See Del. Const., 1792, Art. I, § 7; Md. Declaration of Rights, 1776, Art. XIX; Pa. Declaration of Rights, 1776, Art. IX; Va. Declaration of Rights, 1776, § 8. Mass. Const., 1780, Part I, Art. XI, provided: "Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character. He ought to obtain right and justice freely, and without being obliged

as well as by its prominent position in the Sixth Amendment. Today, each of the 50 States guarantees the right to a speedy trial to its citizens.

The history of the right to a speedy trial and its reception in this country clearly establish that it is one of the most basic rights preserved by our Constitution.

For the reasons stated above, the judgment must be reversed and remanded for proceedings not inconsistent with the opinion of the Court.

*It is so ordered.*

MR. JUSTICE STEWART concurs in the result.

MR. JUSTICE HARLAN, concurring in the result.

While I entirely agree with the result reached by the Court, I am unable to subscribe to the constitutional premises upon which that result is based—quite evidently the viewpoint that the Fourteenth Amendment "incorporates" or "absorbs" *as such* all or some of the specific provisions of the Bill of Rights. I do not believe that this is sound constitutional doctrine. See my opinion concurring in the result in *Pointer* v. *Texas,* 380 U. S. 400, 408.

I would rest decision of this case not on the "speedy trial" provision of the Sixth Amendment, but on the ground that this unusual North Carolina procedure,

---

to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws."

This has been construed as guaranteeing to all citizens the right to a speedy trial. See *Commonwealth* v. *Hanley,* 337 Mass. 384, 149 N. E. 2d 608 (1958). A similar provision was included in the New Hampshire Constitution of 1784, Part I, Art. XIV.

Kentucky, Tennessee, and Vermont, the three States which were admitted to the Union during the eighteenth century, specifically guaranteed the right to a speedy trial in their constitutions. See Vt. Const. 1786, c. I, Art. XIV; Ky. Const. 1792, Art. XII, § 10; Tenn. Const. 1796, Art. XI, § 9.

which in effect allows state prosecuting officials to put a person under the cloud of an unliquidated criminal charge for an indeterminate period, violates the requirement of fundamental fairness assured by the Due Process Clause of the Fourteenth Amendment. To support that conclusion I need only refer to the traditional concepts of due process set forth in the opinion of THE CHIEF JUSTICE.