Margaret Ann KEEVER, Petitioner,

v.

The Honorable Harlan W. BAINTER, Judge of the First Judicial District of Iowa in and for Des Moines County, Respondent.

No. 54348.

Supreme Court of Iowa.

April 9, 1971.

William R. Ruther and William Bauer, Burlinton, for petitioner.

Alan N. Waples, County Atty., Burlington, for respondent.

MOORE, Chief Justice.

Petitioner, Margaret Ann Keever, seeks by certiorari to establish the respondent judge acted illegally in denying her motion to dismiss a murder charge on the ground she had been denied her right to a speedy trial as guaranteed by the Sixth Amendment to the Constitution of the United States, Article I, section 10, of the Iowa Constitution and Iowa Code section 795.2. We quash the writ.

The early pertinent facts are found in the following May 23, 1963 order of District Court Judge E. O. Newell:

"Heretofore and on April 2, 1963, the county attorney of Des Moines County, Iowa, returned into Court a County Attorney's Information charging the defendant,

Margaret Ann Keever, with the crime of murder; and thereafter during the preliminary proceedings under said Information, a reasonable doubt having arisen as to the sanity of the defendant, further proceedings on the charge were suspended, and a trial had upon such question of sanity, as provided by Section 783.1, Code of Iowa, 1962; and it appearing that the jury in said trial has returned a verdict finding that the defendant is now insane, which verdict and finding required that no further proceedings be taken under the information until defendant's reason is restored; and the Court finding that the discharge of the defendant from custody would endanger public peace or safety, all in accordance with Section 783.3, Code of Iowa, 1962, and being advised in the premises:

"It is Ordered that no further proceedings shall be taken under the information until the reason of Margaret Ann Keever is restored, and that said defendant be, and she is, hereby committed to the Mt. Pleasant Health Institute, Mt. Pleasant, Iowa; until she becomes sane, which commitment, custody and proceedings hereafter taken shall be in accordance with the laws of Iowa, and particularly with the provisions of Sections 226.27, 226.28 and 226.29 Code of Iowa 1962.

"The Sheriff of Des Moines County, Iowa, shall deliver the defendant to said institution in accordance herewith, a certified copy hereof being his authority therefor."

The request to suspend the proceedings and for a jury trial on the question of her sanity was made by Miss Keever's court appointed attorneys, Cahill and Peterson. She was then 18 years of age and had spent most of the previous three years in an Illinois Mental Institute. She was charged with stabbing to death her 84 year old woman employer.

Shortly after Miss Keever's commitment some of the personnel unsuccessfully attempted to have her returned to Illinois. On December 31, 1964 three staff psychiatrists sent a letter regarding Miss Keever to William M. Hildreth, then Des Moines County Attorney, stating "while her behavior continues to be aggressive, impulsive, and a management problem, it is nevertheless the opinion of the staff that this patient is not insane and, therefore competent to stand trial."

The record discloses a course of correspondence thereafter between the superintendent of the Mt. Pleasant Institute and the clinical director to the Des Moines County Attorney, the Attorney General's office and the Board of Control of the state institutions. The letters from the institute recognized Miss Keever would probably require institutional care for the remainder of her life and recommended she be transferred to a Davenport institute for additional care but expressed the belief she was able to stand trial and no longer insane.

In response to an inquiry by the then Iowa solicitor general, county attorney Hildreth stated no proper notice had been received relative to Miss Keever's situation. His letter included: "It is quite apparent to us here, however, that she is a management problem and has been for some time. We have received rather reliable reports of some vicious assaults and attacks she has made on individuals during her stay in Mt. Pleasant. I have no doubt but there were probably some members of the staff at Mt. Pleasant at the time or her admission who were perfectly willing to say that she was sane so they could get rid of her."

The solicitor general sent a copy of Hildreth's letter to the State Board of Control and advised they see Des Moines County was given proper legal notice.

On January 12, 1967 Dr. Walter Fox, Superintendent of the Mt. Pleasant Institute sent a letter to county attorney Hildreth referring to the December 31, 1964 letter of the three staff psychiatrists and stating the findings and recommendations of competency to stand trial had not

changed. He therein referred to the court commitment of May 1963 and stated it was his intention to notify the court Miss Keever was ready for discharge and that if it was not a sufficient notice he should be advised and would prepare the necessary warrant. A copy of this letter was sent to District Judge George O. Van Allen and the state department of health.

The record does not reveal the details of action by Hildreth and Judge Van Allen (now deceased) but it clearly discloses they attempted to set up a conference with the Chief of the Mt. Pleasant Medical Staff, Doctor Eggert, regarding the doctor's suggested procedures to assist in Miss Keever's rehabilitation. In a letter to Hildreth, dated August 16, 1968, suggesting a conference, Dr. Eggert stated: "I think it is manifestly clear that we are not necessarily asking that the patient go to Court for any particular type of hearing or any particular type of trial at this point."

Faced with conflicting reports and suggestions from the Institute Doctors, Hildreth sought the attorney general's advice. On August 12, 1968, Larry Seckington, assistant attorney general, wrote Hildreth: "I appreciate your interest in this case in contacting the Mt. Pleasant Mental Health Institute. My contact with that institution has led me to believe that they have been under a somewhat misguided impression as to the legal procedures to be used in handling a case such as this.

"I reviewed the entire file last week and find no sufficient legal notice from them to anyone which would allow the county to assume custody and bring this subject to trial."

In 1966 attorney Cahill became a district court judge. In 1967 attorney Peterson became a municipal court judge. Miss Keever remained at the Mt. Pleasant Mental Health Institute after May 23, 1963 and was regularly visited by members of her family and friends.

On February 5, 1970 another attorney was appointed to represent Miss Keever and a habeas corpus proceeding was started as authorized by Code section 229.37 which provides:

"Habeas corpus. All persons confined as mentally ill shall be entitled to the benefit of the writ of habeas corpus, and the question of mental illness shall be decided at the hearing. If the judge shall decide that the person is mentally ill, such decision shall be no bar to the issuing of the writ a second time, whenever it shall be alleged that such person has been restored to reason."

On trial of the habeas corpus case in Henry County district court Miss Keever was adjudged sane and ordered held for trial on the murder charge in Des Moines county. Her counsel immediately filed a motion to dismiss the murder charge on the ground she had been denied her constitutional rights to a speedy trial. The motion asserted the state had known of her claimed restoration of sanity since at least December 31, 1964 and no good cause existed for the State's failure to afford her a speedy trial.

The motion to dismiss was submitted to Judge Bainter on evidence most of which we have already set out. The records of the institute, including Miss Keever's hospital chart, were put in the record. They include many conflicting statements and opinions regarding her mental state throughout her commitment.

Judge Bainter's findings include: "From a review of the hospital record, being Defendant's Exhibit No. 2, and specifically referring to the nurses' notes portion commencing with January 1, 1969, down through October 23, 1969, the Court makes the following findings:

"There were 16 specific instances where the defendant either threatened or assaulted a patient or a staff member at the Mental Health Institute. The incidents included such things as slapping patients, grabbing a patient by the hair and banging her head on the floor, grab keys away from an

employee or threatening to strike either patients or staff members. During the same period the record discloses five instances where the defendant broke out windows in the hospital. This does not include instances when she stated she was going to break windows and asked to be placed in cuffs and a waist belt. The record during this period discloses ten instances when the defendant was placed in a belt with cuffs because of her conduct at the hospital. The record also discloses during this same period of time there were several instances where the defendant either with broken glass from windows or light bulbs cut her wrists or cut at her throat, and each instance the wounds were determined to be quite superficial. There was one incident during the period in question when the defendant threatened to kill a female patient because she had been flirting with the defendant's boyfriend. The record discloses that the female was removed from the ward that the defendant was on. The record further discloses during this same period that there were many days in which the defendant's conduct was pleasant and when she was not a custodial problem. The doctors' progress notes bearing the date, October 31, 1968, and over the signature of Dr. Lyons contains the following statement, to-wit: 'Back on 2W. The usual manipulative behavior has resumed. Full activities have been resumed with little real investment on the patient's part. Patient thoroughly and probably irreversibly institutionalized.'" In November 1968 Miss Keever attempted suicide by cutting her wrists and the right side of her neck with a piece of window glass.

Judge Bainter overruled and denied the motion to dismiss the county attorney's information charging Miss Keever with murder. She asserts in this certiorari proceeding the respondent judge acted illegally and without jurisdiction in that there is no substantial evidence to support the respondent judge's ruling she had not been denied a speedy trial.

■ I. The Sixth Amendment right of an accused to a speedy and public trial is made applicable to state procedure through the due process clause of the Fourteenth Amendment in Klopfer v. State of North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L. Ed.2d 1. State v. Bowers, Iowa, 162 N. W.2d 484, 487.

Petitioner relies heavily on Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L. Ed.2d 26 (May, 1970) where the court ordered dismissal of a Florida robbery charge after Dickey, a federal prisoner, over a seven year period had requested and demanded trial on the robbery charge. After pointing out Dickey was available at all times to the State for trial and no reasonable effort had been made to bring him to trial the Supreme Court held he had been denied his Sixth Amendment right to a speedy trial. It is vastly different and readily distinguishable factually with the case at bar.

■ In his special concurring opinion Mr. Justice Brennan at pages 1575, 90 S. Ct. 37 and 38, 26 L.Ed.2d says: "What are the criteria to be used in judging the constitutionality of those delays to which the safeguard applies? This Court has stated that '[t]he right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.' Beavers v. Haubert, supra, 198 U.S. 77, at 87, 25 S.Ct. 573, at 576, 49 L.Ed. 950 at 954. We have also observed that '[w]hile justice should be administered with dispatch, the essential ingredient is orderly expedition and not mere speed.' Smith v. United States, 360 U.S. 1, 10, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041, 1048 (1959). It appears that consideration must be given to at least three basic factors in judging the reasonableness of a particular delay: the source of the delay, the reasons for it, and whether the delay prejudiced interests protected ·by the Speedy Trial Clause.

"A defendant may be disentitled to the speedy trial safeguard in the case of a delay for which he has, or shares, responsibility. It has been held, for example, that an accused cannot sustain a speedy trial claim when delay results from his being a fugitive from justice, making dilatory pleadings or motions, or failing to object when a continuance is granted the government, or from delay occasioned by his incompetence to stand trial, e. g., United States v. Davis, 365 F.2d 251, 255 (C.A. 6th Cir. 1966)."

We recognized and applied the above stated general principles in Doerflein v. Bennett, 259 Iowa 785, 792, 793, 145 N.W. 2d 15, 20, 21.

In addition to United States v. Davis, supra, which holds an accused cannot complain of his denial of a speedy trial while in a mental institution for evaluation or under commitment because of being mentally incompetent see Johnson v. United States, 10 Cir., 333 F.2d 371; Nickens v. United States, 116 U.S.App.D.C. 338, 323 F.2d 808; Howard v. United States, 5 Cir., 261 F.2d 729; Barfield v. Settle, W.D.Mo., 209 F.Supp. 143.

II. In an effort to supplement and render more meaningful an accused's rights to a speedy trial under Article I, section 10 of the Iowa Constitution our legislature has by Code section 795.2, as amended, provided: "Delay in trial. If a defendant indicted for a public offense, *whose trial has not been postponed upon his application,* be not brought to trial within sixty days after the indictment is found, the court must order it to be dismissed, unless good cause to the contrary be shown. An accused not admitted to bail and unrepresented by legal counsel, shall not be deemed to have waived his privilege of dismissal or be held to make demand or request to enforce a guarantee of speedy trial, and the court on its own motion shall carry out the provisions of this section as to dismissal." (Our emphasis)

Petitioner does not question the fact delay of the murder trial was at her instance and that she was adjudged to be insane in May 1963. She argues however failure to bring her to trial after the 1964 letter by the three staff psychiatrists or superintendent Fox's letter of January 12, 1967 violated her constitutional right to a speedy trial.

As provided by Judge Newell's order Miss Keever was committed to Mt. Pleasant Mental Health Institute under the provisions of Code sections 226.27, 226.28 and 226.29. They provide:

"226.27. Patient accused of crime. When a patient of any state hospital who was committed to such hospital at a time when he was formally accused of crime in any county of the state, regains his reason, the superintendent shall thereupon issue his warrant for the return of such person to the jail of the county in which such charge is pending and notify the sheriff of such county accordingly who shall proceed to such hospital and execute such warrant.

"226.28. Return by sheriff. The sheriff shall in writing make his return of service on said warrant and deliver such warrant and return to the clerk of the district court of his county. Said clerk shall forthwith make a copy of the warrant and return and mail the same to the said superintendent who shall file and preserve it.

"226.29. Discharge of mentally ill criminals. No patient who may be under criminal charge or conviction shall be discharged without the order of the district court or judge, and notice to the county attorney of the proper county."

It is undisputed the superintendent did not at any time issue his warrant for the return of Miss Keever to the Des Moines County sheriff.

The problem thus presented is not new to this court. In State v. Jackson, 252

Iowa 671, 108 N.W.2d 62, the respondent judge set aside a robbery conviction against one Burris on the ground he had been denied a speedy trial. Burris had been adjudged insane and incompetent to stand trial. He was committed to the insane ward at the men's reformatory at Anamosa. Soon after his commitment the institution doctor formed an opinion he was sane. No notice was given to the sheriff. We held the respondent judge acted illegally.

At page 676, 252 Iowa, page 65, 108 N. W.2d, we say:

"It must be remembered that at all times until January 27, 1960, Burris was held in the department for criminally insane of the reformatory under an adjudication of insanity. Whether the superintendent of this department, or the warden of the reformatory, or both, were remiss in failing to find him to have recovered his sanity at an earlier date and notifying the Polk County sheriff and county attorney is beside the point. There was nothing the prosecuting officers of the county could do in the way of bringing Burris to trial so long as he was held under the insanity judgment rendered after trial by a jury on that issue. Burris had a remedy, provided by Code section 229.37. This gives one confined as insane the right to the writ of habeas corpus, and says 'and the question of insanity shall be decided at the hearing.' "

Our review of the record reveals substantial support for the conclusion of assistant attorney general Seckington and the respondent judge that sufficient legal notice had not been given to allow Des Moines County to assume custody of petitioner and bring her to trial.

■ Until Miss Keever was adjudged in the habeas corpus proceedings to have regained her sanity she was under the record here properly held and her trial delayed for good cause under the order and commitment of May 23, 1963.

Petitioner has failed to establish the respondent judge acted illegally.

MOORE, C. J., and MASON, REES and UHLENHOPP, JJ., would quash the writ.

BECKER, STUART, RAWLINGS and LeGRAND, JJ., would sustain the writ.

The action of the trial court is affirmed by operation of law and the writ is therefore annulled.

Writ Annulled.

BECKER, Justice.

I respectfully dissent.

The principles relied upon by the majority are sound where a defendant is found incompetent to stand trial, confined in a mental health institution until competent and tried within a reasonable time after competency is found to have been regained. There can be no quarrel with the notion that mental treatment of a defendant is a valid reason for delay.

I. In all of the cases cited by the majority which involve this fact situation defendant was either still held as incompetent or was tried with reasonable promptness after the disability was removed. No case considers the problem of delay after the alienist notifies the State of his opinion that defendant is now competent to stand trial and a new unreasonable delay develops due to the State's unwillingness or inability to proceed.

Stated otherwise, the delay of 19 months while defendant was considered incompetent to stand trial is acceptable and does not constitute an unconstitutional denial of speedy trial. The cases cited by the majority support such a finding. But a delay of an additional five years after State alienists notified a State prosecutor and State judge that competency had, in their

opinion, been restored, raises a new and entirely different problem.

The closest case in point of fact is probably our own State v. Jackson, 252 Iowa 671, 108 N.W.2d 62 (1961) but Jackson is also distinguishable on its facts (in addition to change in both statutory and case law since 1961). There the alienist had a private opinion as to defendant's competency almost immediately on admission to the mental facility but did not certify mental competence until almost two years later. Thereafter defendant was promptly returned for trial, tried and found guilty.

Here the written notification of resumption of competency was given to appropriate State officials on December 31, 1964 but the State took no action until February 5, 1970. Then a lawyer was at long last appointed. Habeas corpus was instituted, trial had and defendant was found competent. Defense counsel immediately moved for dismissal of the instant case because of denial of a speedy trial.

The factual recitation in the majority opinion can lead to but one conclusion. The five-year delay was wholly due either to inefficiency or lack of communication on the part of the State officials involved.

County Attorney Hildreth's letter as quoted by the majority is at once revealing and raises the true issue here; i. e., what was the duty of the State when the alienist notified its responsible officials that defendant was competent to stand trial? It is submitted a county attorney cannot properly take the position that Hildreth took; that is, disagree with the alienist's opinion and effectively deny prompt legal determination of the issue of competency.

In State v. Jackson, supra, we said the county attorney could do nothing because competency was not certified. Here competency was certified in writing. It is no answer to demean the certification because it was a letter to the county attorney and the judge rather than a "warrant" to the sheriff. The sheriff's duties were purely ministerial in any event. The executory and judicial power was in the county attorney and judge. A holding that the argument about the technical method of communication between various State officials provides an excuse for unconscionable delay violates due process as I see it.

Also, all of the evidence in the record about defendant's violent propensities while still in the Mental Health Institute during the five-year period is immaterial. When the restoration of competency was certified by the proper State psychiatrists the State had a positive duty to determine whether this new finding permitted trial or not. *On that issue* defendant's behavior, her symptoms and her condition were all relevant. But the State did not provide a proper judicial forum for such determination. Instead technical objections were raised between various State officers. These objections prevented determination of the issue.

At this point we cannot excuse by implication the action of the county attorney and the judge by reference to the conflicting reports and suggestions. The duties of the county attorney and the judge were clear. They did not need either the advice of the doctors or the attorney general on the matter. It was their duty to make a judicial determination of competency or incompetency after notice and hearing.

The majority quotes a portion of Mr. Justice Brennan's special concurrence in Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26. Justice Brennan's long and thoughtful concurrence contains much more. Another pertinent quotation follows:

"When is governmental delay reasonable? Clearly, a deliberate attempt by the government to use delay to harm the accused, or governmental delay that is 'purposeful or oppressive,' is unjustifiable. See United States v. Provoo, supra; Pollard v. United States, supra. The same may be true of any governmental delay that is unnecessary, whether intentional or

negligent in origin. A negligent failure by the government to ensure speedy trial is virtually as damaging to the interests protected by the right as a purposeful failure; when negligence is the cause, the only interest necessarily unaffected is our common concern to prevent deliberate misuse of the criminal process by public officials. Thus the crucial question in determining the legitimacy of governmental delay may be whether it might reasonably have been avoided—whether it was unnecessary. To determine the necessity for governmental delay, it would seem important to consider, on the one hand, the intrinsic importance of the reason for the delay, and, on the other, the length of the delay and its potential for prejudice to interests protected by the speedy trial safeguard. * * *."

By the above criterion the five-year delay here was clearly unreasonable. Justice Brennan also points out that silence or inaction can no longer be construed as an implied relinquishment of the right to a speedy trial. It would be hard to find a fact situation where implied relinquishment is less apropos. Defendant was 18 years old at time of admission, held as mentally incompetent for 19 months, still apparently mentally disturbed, low I.Q., without legal advice or a realistic chance to get legal advice. Such a patient simply cannot be penalized because she did not, as required by State v. Jackson, supra, seek a writ of habeas corpus.

There is no need to pursue this subject further. The facts speak for themselves. Defendant was denied a speedy trial due to the incompetence or lack of communication between State officials. We should not be reluctant to so hold where the record is so clear.

II. No case is decided in a vacuum. Undoubtedly this court and society's concern for continued institutionalization of this young woman is strong. She should be institutionalized until she is cured, if a cure is possible. But this does not justify a murder trial when her constitutional rights have been violated.

It is not necessary that *every* criminal case involving the mental competency of an individual *must* be tried. We have evidence of mental incompetency and institutionalization for three years prior to the crime and for seven years after the crime. If the jury is apprised, as they should be, of the existence of section 785.19, Iowa Code, 1971,[1] they will know a not guilty verdict by reason of insanity will not be the last act of the drama. The court still has the power and duty to determine whether she should be readmitted to society. If the evidence is as we have been given it, the jury cannot find this woman sane at the time of commission of the offense. This must be true under the M'Naughten or any other rule.

Be that as it may, we have a duty in this case to order a dismissal. The State can and undoubtedly will utilize statutory procedures to continue defendant's confinement on grounds she is mentally ill, if such be the case. It is one thing to be adjudged incompetent; it is quite another to be branded a murderess. I would order dismissal.

STUART, RAWLINGS and LeGRAND, JJ., join in Division I of this dissent.

1. "Acquittal on ground of mental illness—commitment. If the defense is mental illness of the defendant, the jury must be instructed, if it acquits him on that ground, to state that fact in its verdict. The court may thereupon, if the fendant is in custody, and his discharge is found to be dangerous to the public peace and safety, order him committed to one of the mental health institutes or the Iowa security medical facility, or retained in custody, until he demonstrates good mental health and is considered no longer dangerous to the public peace and safety or to himself."