NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0001n.06
Filed: January 3, 2007

No. 05-1786

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JOHN HENRY DIXON, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| HAROLD WHITE, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |

**Before: CLAY and ROGERS, Circuit Judges; KATZ, District Judge[*]**

**ROGERS, Circuit Judge.** We reverse the district court's denial of John Henry Dixon's

habeas petition because the Michigan courts unreasonably applied the United States Supreme Court's

holding in *Doggett v. United States*, 505 U.S. 647 (1992), when they determined that Dixon did not

suffer a violation of his speedy trial right. *See* U.S. Const. amend. VI ("In all criminal prosecutions,

the accused shall enjoy the right to a speedy and public trial. . . ."); *Klopfer v. North Carolina*, 386

U.S. 213, 222 (1967) (holding that the Fourteenth Amendment makes the Sixth Amendment

applicable to states proceedings).

On January 16, 1994, state authorities arrested Dixon and charged him with two informations

of sexually penetrating his girlfriend's daughter, Ann Lear, in violation of Michigan law. *See* Mich.

---

[*]The Honorable David A. Katz, United States District Judge for the Northern District of
Ohio, sitting by designation.

Comp. Laws § 750.520b(1)(a) (first degree criminal sexual conduct with a person under the age of thirteen). Seven months later, on August 16, 1994, Dixon filed a Demand for Speedy Trial. Five months later, on January 17, 1996, Dixon moved to dismiss the two informations against him for lack of a speedy trial. He renewed the motion eight months later, on November 20, 1996, and then filed another motion to dismiss seven months later, on June 2, 1997. On June 20, 1997, the day that the trial began—over three-and-a-half years after the state filed its informations against Dixon—counsel renewed Dixon's motion, which the trial court rejected.

There were several reasons for the three-and-a-half-year delay. First, eight months of the delay resulted from a series of stipulated adjournments. Second, some of the delay resulted from a congested court docket and a court error that accidentally removed the case from the state court's docket. Third, Dixon requested Lear's psychological records, which the Oakland Family Services originally refused to produce and which the court employees negligently handled.

Dixon eventually received a trial, during which Lear testified that her mother's live-in boyfriend, Dixon, sexually assaulted her on at least two separate occasions. First, Lear testified that in October 1993, when she was twelve years old, Dixon asked her to join him alone in the family basement. It was there, according to Lear, that Dixon pulled down her pants and licked her vagina. Lear testified that she kicked Dixon, causing him to stop, and then she returned upstairs. Lear also claimed that Dixon threatened to hurt her if she told anyone about the incident.[1] Second, Lear

---

[1]Lear's brother, John Lear Jr., testified regarding other attempts by Dixon to prevent the alleged incident from coming to light. John Lear Jr. testified that, in January 1994, Dixon promised Lear Jr. $100 if he and his sister "kept their mouths shut" about the incidents.

testified that, in December 1993, Dixon entered her bedroom, pulled down her pants, and touched her vagina with his pinky finger. Lear also testified about other instances of sexual abuse for which the state did not charge Dixon. Specifically, Lear testified that, from the time that she turned nine or ten, Dixon repeatedly sexually assaulted her at around seven o'clock in the morning.

Mary Larkin, an Assistant Oakland County Prosecutor, testified that Lear told her that, "Everything I [Lear] said about him [Dixon] was a lie. He left without telling me. I was mad at him. I got the idea to make up the [allegations] from his cousins. . . . None of it happened, I'm coming forward now because he shouldn't go to jail for something he didn't do." In a later conversation with Larkin, Lear returned to her original story and insisted, "What I said in court and what I told you earlier on [about the allegations against Dixon] is the truth."

Finally, the state called Dr. Michael Eadie, who testified about his medical examination of Lear. According to Dr. Eadie, during his examination, Lear told him that Dixon vaginally manipulated her using his tongue and fingers, but not his penis. Dr. Eadie testified that he observed that Lear's hymenal ring was not intact, a fact consistent with Lear's allegations against Dixon. On cross-examination, Dr. Eadie conceded that the injury could have occurred as a result of penile intercourse, masturbation, or the insertion of a tampon.

Dixon was the only defense witness. He testified that, in October 1993, he asked Lear to come to the basement to help him fix the furnace; however, he insisted that nothing sexual occurred between him and Lear. He also testified that he never went to Lear's bedroom in the middle of the

night and never encouraged Lear to keep her mouth shut.[2]  On June 26, 1997, a jury convicted Dixon of both counts, and on September 22, 1997, a judge sentenced him to concurrent state prison terms of 25 to 50 years on each count.

The jury did not hear evidence that Dixon considers crucial to his defense.  Pertaining to the violation of the right to a speedy trial, the jury did not hear evidence from Patrick Mercier, Dixon's employer.  According to Dixon's counsel, Mercier would have testified that Dixon was usually at work by eight o'clock in the morning.  Dixon planned to use Mercier's testimony to prove that Dixon could not have assaulted Lear at seven o'clock in the morning, as she alleged that he did on numerous occasions (although not the two particular occasions for which the state charged Dixon). Dixon's counsel explained to the court that "we did attempt to locate Mr. Mercier as soon as we found out that we were going to be trying the case last Thursday. . . .  [However,] the defendant has been advised that Patrick Mercier is no longer living in the State of Michigan, and he's no longer available for us to call as a witness."

On October 7, 1997, Dixon filed a motion for a new trial raising the speedy trial and ability-to-raise-a-defense issues, which the trial court denied on October 22, 1997, because Dixon did not show that the delay prejudiced his defense.  The state trial court noted that Mercier's testimony constituted "alibi testimony" and that "defense counsel has failed to make any request of this Court or the People relative to securing said witness for the purpose of proceeding to trial."  On December

---

[2]As to John Lear, Jr.'s accusations that Dixon offered him $100 if he and Lear kept their mouths shut, Dixon testified that he did not make such an offer, but instead told John Lear, Jr. that "The only way I could really take you fishing is if Ann [Lear] went forward and told the truth."

15, 1997, Dixon appealed, and the Michigan Court of Appeals affirmed his conviction and sentence

on February 25, 2000. *People v. Dixon*, No. 208349 (Mich. Ct. App. Feb. 25, 2000). The Michigan

Court of Appeals balanced the four factors that the United States Supreme Court identified in *Barker*

*v. Wingo*, 407 U.S. 514 (1972), and held that Dixon did not suffer any prejudice because he did not

show that Mercier would have offered relevant testimony. Indeed, the crimes for which the state

charged Dixon did not occur during working hours, and Mercier's testimony, therefore, was not

relevant to the central issues in the case. On October 30, 2000, the Michigan Supreme Court denied

his delayed Application for Leave to Appeal. *People v. Dixon*, No. 116735 (Oct. 30, 2000). On

October 22, 2001, Dixon filed a habeas petition under 28 U.S.C. § 2254, raising the speedy trial and

ability-to-raise-a-defense issues in this appeal. The district court denied the motion on April 21,

2005, because there was no showing of "substantial prejudice" as a result of the failure to locate

Mercier.[3]

Dixon is entitled to a writ of habeas corpus only if he can show that Michigan's adjudication

of his claims on the merits

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

---

[3]Dixon also argues that he was denied effective assistance of counsel when his counsel failed to present evidence that Lear told her grandmother, Aline Dixon, that Lear's half-brother, Dennis Lear, would climb into Ann Lear's bed, demand that she pull off her clothes and, if she refused, would tear off her clothes. In addition, Dixon argues that he was denied effective assistance of counsel when his attorney failed to present evidence that Lear accused Julian "Andy" Dixon, John Dixon's brother, of sexual assault. Because we hold that John Dixon suffered a violation of his right to a speedy trial, we do not address these claims.

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

The Michigan courts in this case engaged in an "unreasonable application of clearly established Federal law" when they held that *Doggett* did not require dismissing the informations in this case. *See* 28 U.S.C. § 2254(d). In *Doggett*, DEA agents set out to arrest Marc Doggett within weeks of his indictment only to find out that Doggett had left for Colombia four days earlier. 505 U.S. at 648-49. Efforts to apprehend Doggett failed after his name vanished from the United States Treasury Enforcement Communication System, Panamanian officials released Doggett from custody, and a DEA agent failed to pursue the case. *Id.* at 649-50. Eight-and-a-half years later, a Marshals' Service check of outstanding warrants revealed Doggett's name and authorities arrested him in the United States, where he had settled for six years. *Id.* Doggett argued that the eight-and-a-half-year delay after his indictment violated his right to a speedy trial even though he could not prove actual prejudice. The Supreme Court agreed, referring to the Government's "lethargy" in prosecuting the case. *Id.* at 653.

This case is materially indistinguishable from *Doggett* with respect to the four relevant speedy-trial inquiries, namely "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for the delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Id.* at 651. First, although the three-and-a-half-year delay in this case is less than the eight-and-a-

half-year delay in *Doggett*,[4] it is still uncommonly long. Second, as in *Doggett*, the state is more to blame for the delay.[5] Third, Dixon, like Doggett, raised his right to a speedy trial, and, fourth, like Doggett, could not show actual prejudice from the delay.

Indeed, three facts suggest that the violation of the right to a speedy trial in this case was worse than the one that the Supreme Court found unconstitutional in *Doggett*. First, in this case, Dixon knew that the state filed informations against him, while in *Doggett*, the defendant did not know about the arrest warrant. Thus, while Dixon lived three-and-a-half years with the weight of prosecution on his shoulder and watched his desire to clear his name go unfulfilled, Doggett did not. Second, and relatedly, the government in *Doggett* did not disregard Doggett's requests for a speedy trial because Doggett did not know about his indictment. Here, in contrast, the state failed to protect Dixon's known desire to have a speedy trial after Dixon raised his speedy trial rights on four separate occasions. Thus, while the government in *Doggett* was unaware of a speedy trial demand, the state in this case knew about Dixon's desire to prove his innocence at trial, yet failed to secure his right to a speedy trial. Third, Dixon presented an argument that he suffered prejudice because his

---

[4]The state was not responsible for the entire eight-and-a-half-year delay as Doggett made his apprehension more difficult by leaving the United States. The Supreme Court noted that Doggett resided in the United States for six years before American authorities apprehended him. 505 U.S. at 650.

[5]Of the 41 months delay, 8 months of delay resulted from stipulated adjournments (attributable to both parties), 6 months resulted from a clerk mistakenly typing "final disposition" on the docket sheet (attributable to the state), 17 months resulted from difficulties obtaining Lear's psychological records from the Oakland Family Services (a fraction of which is attributable to Dixon, who sought the records), and the remaining 10 months resulted from a congested trial docket (attributable to the state).

employer was unable to testify that Dixon arrived on time during the time period at issue in the case.

While the Michigan courts concluded that the testimony would not have exonerated Dixon, the fact

that Dixon made a showing (however weak) that he actually suffered prejudice distinguishes this

case from *Doggett*, where the defendant presented no evidence of actual prejudice.

Because this case is materially indistinguishable from *Doggett,* the Michigan courts engaged

in an unreasonable application of United State Supreme Court precedent when they held that the

delay in this case did not violate Dixon's right to a speedy trial. Having found a violation of the right

to a speedy trial, we do not reach Dixon's remaining arguments on appeal. *Cf. People v. Mikula*, 269

N.W.2d 195, 199 (Mich. Ct. App. 1978); *Lewis v. Wilkinson*, 307 F.3d 413, 422 (6th Cir. 2002).

## Conclusion

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND

to the district court for the grant of a writ of habeas corpus.