COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
NO. 2-01-288-CR
 
KENNETH DWAIN ADKINS   
                                                                
APPELLANT
V.
THE STATE OF TEXAS   
                                                                        
STATE
------------
FROM CRIMINAL DISTRICT COURT NO. 2 OF
TARRANT COUNTY
------------
OPINION
ON APPELLANT'S
PETITION
FOR DISCRETIONARY REVIEW
------------
We withdraw our December 19, 2002 opinion and judgment and substitute the
following in its place.
INTRODUCTION
Appellant Kenneth Dwain Adkins was indicted for the offense of possession of
a controlled substance with intent to deliver. The indictment included a deadly
weapon paragraph, an enhancement paragraph, and three habitual offender
paragraphs. See Tex. Penal Code Ann. § 12.42(b), (d) (Vernon Supp.
2002); Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (Vernon Supp. 2002).
Appellant filed a motion to suppress, which the trial court denied. Appellant
pled not guilty to the charged offense, but the jury found him guilty of the
lesser-included offense of possession of a controlled substance. The jury also
found that appellant used or exhibited a deadly weapon in committing the
offense. The trial court found two of the habitual offender paragraphs to be
true and assessed punishment at forty years' confinement. See Tex.
Penal Code Ann. § 12.42(d). In five issues, appellant complains that: (1) the
trial court erred when it overruled his motion to suppress and corresponding
objection at trial; (2) the trial court erred when it denied his motion for
directed verdict; (3) the trial court admitted statements he made to the
arresting officers in violation of Miranda; and (4) the trial court
should have set aside the indictment for failure to afford him a speedy trial.
We reform the trial court's judgment and affirm it as reformed.
BACKGROUND
On October 29, 1998, Officer Ray Morales of the Arlington Police Department
was dispatched to a 7-Eleven convenience store to meet with Joseph Hayworth.
Hayworth, who had previously provided Officer Morales with reliable information,
told Morales that he had seen a brown prescription bottle full of narcotics fall
on the floorboard of appellant's white 1988 Chevy truck as appellant was getting
out of it. Hayworth informed Morales that the truck was located in a parking lot
in front of a CiCi's Pizza restaurant, a half-block to the north of the
7-Eleven. Officer Dale Horton arrived, and he and Officer Morales parked their
patrol cars and walked to the parking lot.
Appellant was not present when Horton and Morales reached his truck. Through
the window, using flashlights, Officer Morales could not see any drugs, but
noticed a wooden stick lying on the seat. Morales, who had encountered appellant
previously, saw appellant and another male walking toward Cici's Pizza. Officer
Morales called out to appellant. Appellant continued towards the restaurant.
After Morales called to appellant twice, appellant stopped, reached his hand
inside his pants pocket, and told the officers that he didn't have any drugs.
Officer Morales performed a patdown on appellant, looking for any weapons.
Officer Horton then asked appellant if the truck was his and if he had driven it
there. Appellant responded yes to both questions. Appellant asked if there was a
problem, and began to walk toward his truck. The officers followed appellant and
his companion towards the truck.
When they reached the truck, Officer Horton asked appellant who the wooden
stick belonged to, and appellant said it was his. Appellant asked the officers
if they wanted to see the stick and unlocked the passenger side door with a
remote keyless entry device. Officer Horton instructed appellant, however, not
to get in the truck. Despite Officer Horton's instruction, appellant entered the
truck and emerged with the stick. Both officers testified that they both drew
their guns and ordered appellant to drop the stick. Appellant stood there
holding the stick and, after two or three seconds, dropped it.
After appellant dropped the stick, the officers arrested him, without
obtaining a warrant, for unlawfully carrying a weapon. See Tex. Penal
Code Ann. § 46.02(a) (Vernon Supp. 2002). During the search incident to arrest,
Officer Morales searched the passenger compartment of the truck. Officer Morales
folded down the seat and found a brown prescription bottle behind the seat on
the driver's side. The bottle contained twenty-five individually wrapped rocks
of cocaine.
DISCUSSION
Speedy Trial
In his fifth issue, appellant complains that his constitutional right to a
speedy trial under the Sixth Amendment was violated. Because a claim of a speedy
trial violation potentially entitles appellant to a dismissal instead of a new
trial, we will discuss it before his other issues. See Brecheisen v. State,
4 S.W.3d 761, 764-65 (Tex. Crim. App. 1999) ("[T]he only possible remedy
for a violation of the Sixth Amendment right to a speedy trial is
dismissal.").
The right to a speedy trial is guaranteed by the Sixth Amendment of the
United States Constitution and applies to the states through the Fourteenth
Amendment. Klopfer v. North Carolina, 386 U.S. 213, 222-23, 87 S. Ct.
988, 993 (1967). Additionally, our own state constitution and code of criminal
procedure guarantee a defendant's right to a speedy trial. Tex. Const. Art. I §
10; Tex. Code Crim. Proc. Ann. art. 1.05 (Vernon Supp. 2002). The right to a
speedy trial under the Texas Constitution has been interpreted to be congruent
with the right guaranteed by the federal constitution; thus, we use the same
balancing test used by federal courts to determine if a violation of the right
has occurred. Harris v. State, 827 S.W.2d 949, 956 (Tex. Crim. App.), cert.
denied, 506 U.S. 942 (1992).
In Barker v. Wingo, the United States Supreme Court set forth the
balancing test that federal courts use in evaluating speedy trial claims. 407
U.S. 514, 530-32, 92 S. Ct. 2192-93 (1972). Under this test, courts must weigh
and then balance four factors: (1) the length of the delay; (2) the reason for
the delay; (3) whether the defendant has asserted his right to a speedy trial;
and (4) whether the delay prejudiced the defendant. Id.; State v.
Munoz, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999). No one factor is
deciding in determining whether a defendant has been deprived of the right to
speedy trial, and courts must consider all of the factors together along with
any other relevant circumstances. Barker, 407 U.S. at 533, 92 S. Ct. at
2193. The appropriate standard of review of a trial court's decision on a speedy
trial claim is a bifurcated standard of review. Munoz, 991 S.W.2d at
821. The reviewing court applies an abuse of discretion standard for the factual
components and a de novo standard for the legal components of the trial court's
decision. Id.
Length of Delay
To trigger a speedy trial analysis, the defendant must demonstrate that the
delay is of sufficient length to be considered presumptively prejudicial under
the circumstances of the case. See Barker, 407 U.S. at 530, 92 S. Ct.
at 2192; Schenekl v. State, 996 S.W.2d 305, 312 (Tex. App.--Fort Worth
1999), aff'd, 30 S.W.3d 412 (Tex. Crim. App. 2000). The length of the
delay is measured from the time of arrest until the time of trial. Schenekl,
996 S.W.2d at 312 (citing Emery v. State, 881 S.W.2d 702, 708 (Tex.
Crim. App. 1994), cert. denied, 513 U.S. 1192 (1995)). Although there
is not a specific length of time that triggers a speedy trial analysis, some
courts presume that a delay longer than eight months is prejudicial. Harris,
827 S.W.2d at 956; Schenekl, 996 S.W.2d at 312. In this case, appellant
was arrested on October 29, 1998. The case proceeded to trial on June 26, 2001,
about thirty-two months later. The State correctly concedes that this period is
sufficient to trigger our analysis of the remaining Barker factors. See
Schenekl, 996 S.W.2d at 312.
Our analysis of the length of delay does not end with the conclusion that it
is presumptively prejudicial for purposes of triggering review of the other Barker
factors. We must also consider whether the delay as a whole is excessive based
on the circumstances of the case. See Zamorano v. State, No. 1442-00,
slip op. at 6, 2002 WL 31018611, at *2-3 (Tex. Crim. App. September 11, 2002).
The United States Supreme Court has stated that "the delay that can be
tolerated for an ordinary street crime is considerably less than for a serious,
complex conspiracy charge." Barker, 407 U.S. at 531, 92 S. Ct. at
2192. This case is a "plain-vanilla," single-defendant possession and
possession with intent to deliver case. We hold that on the facts of this case,
the almost thirty-two month delay weighs against the State in our analysis of
the Barker factors.
Reason for the Delay
Once a court determines that the length of the delay is sufficient to trigger
a speedy trial analysis, it is the State's burden to show a reason to excuse the
delay. Phillips v. State, 650 S.W.2d 396, 400 (Tex. Crim. App. 1983); Haney
v. State, 977 S.W.2d 638, 642 (Tex. App.--Fort Worth 1998, pet. ref'd), abrogated
in part on other grounds, Howland v. State, 990 S.W.2d 274 (Tex.
Crim. App.), cert. denied, 528 U.S. 887 (1999). In this case, appellant
was originally indicted for possession of a controlled substance on February 11,
1999. Appellant was subsequently re-indicted five times.(1)
For each pending indictment, the State announced that it was ready for
trial. The record reveals that the State never requested a continuance. The only
continuance that was ever requested in any of the pending cases was filed by
appellant while the first indictment was pending, on May 21, 1999. Despite
numerous settings, the case did not go to trial until June 26, 2001. The trial
court, having been recently assigned to this case, indicated at the pretrial
hearing that he did not know why this case did not go to trial despite the
numerous settings.
The State asserts that the delay was a
result of an overcrowded trial docket and, thus, there was a neutral reason for
the delay. See Barker, 407 U.S. at 531, 92 S. Ct. at 2192; Schenekl,
996 S.W.2d at 312; Parkerson v. State, 942 S.W.2d 789, 791 (Tex.
App.--Fort Worth 1997, no pet.). The State never moved for a continuance and
filed a notice of ready after each re-indictment; the docket sheets do not
indicate why this case did not go to trial on the first eight setting dates.
Under these facts, the State asserts that we should assume that the case simply
was never reached. The fact that the case was not reached does not necessarily
reflect, however, that the trial docket was crowded. The record does not show
which other cases were reached in front of this case or how cases are
prioritized in this particular trial court. In light of these omissions in the
record, we cannot conclude that the State has met its burden of showing a reason
for the delay. Thus, the second Barker factor in this case also weighs
against the State.
Assertion of the Right to
Speedy Trial
The third factor to consider is whether
the defendant asserted his right to a speedy trial. This factor is given
"strong evidentiary weight." See Barker, 407 U.S. at 531, 92
S. Ct. at 2192; Haney, 977 S.W.2d at 642. Failure to assert the right
will make it difficult for a defendant to prove he was denied a speedy trial. Schenekl,
996 S.W.2d at 313. Further, if a defendant asserts his speedy trial right but
requests a dismissal instead of a trial, his claim will be attenuated. Id.
In this case, thirty-two months passed
between appellant's arrest and his trial. Appellant did not assert his right to
a speedy trial until June 8, 2001, a mere eighteen days before the case went to
trial. When he did assert his right to a speedy trial, he did not request a
trial, but requested that the indictment be dismissed with prejudice. Because
appellant waited until just before trial to assert his rights and because he
"moved to dismiss rather than asking for a speedy trial, . . . the third Barker
factor . . . weigh[s] against him." Schenekl, 996 S.W.2d at 312; see
Barker, 407 U.S. at 531-32, 92 S. Ct. at 2192-93; Haney, 977
S.W.2d at 642.
Prejudice
The final factor to consider is whether
the delay prejudiced the defendant. Prejudice should be determined in light of
the interests the speedy trial right was designed to protect. Barker,
407 U.S. at 532, 92 S. Ct. at 2193. The right was designed to prevent: (1)
oppressive pretrial incarceration; (2) anxiety over the pending charges; and (3)
impairment of an accused's ability to present a defense. Harris, 827
S.W.2d at 957; Schenekl, 996 S.W.2d at 313. Under this factor, it is
the defendant's initial burden to make a showing of prejudice. Schenekl,
996 S.W.2d at 313.
Appellant has failed to make an initial
showing of prejudice. First, appellant had been released on bond pending trial
and, thus, did not suffer an extensive pretrial incarceration. See Schenekl,
996 S.W.2d at 313-14; Parkerson, 942 S.W.2d at 792. Second, appellant
did not offer any evidence in support of his motion asserting his speedy trial
right. As a result, there is nothing in the record to tell us what level of
anxiety, if any, appellant suffered as a result of the thirty-two month delay.
Finally, appellant has not shown how the delay impaired his defense. Appellant's
counsel made only the bare assertion at the pretrial hearing that it was
"pretty hard to get witnesses together . . . after all this time." The
fact that it might have been difficult to procure witnesses, however, does not
equate to those witnesses being unavailable. Even assuming that witnesses were
unavailable, appellant did not inform the trial court of who those witnesses
were, how their testimony would have been relevant, and what efforts he had made
to get them to trial. See Harris v. State, 489 S.W.2d 303, 308 (Tex.
Crim. App. 1973); Meyer v. State, 27 S.W.3d 644, 650 (Tex. App.--Waco
2000, pet. ref'd). Thus, the final Barker factor weighs against
appellant.
In conclusion, we believe the Barker
factors, when applied to the facts in this case, weigh in favor of the State.
Although the first and second factors weigh against the State, the third and
fourth factors weigh more heavily against appellant. We have previously stated
that "[w]hen the failure to assert the right [to speedy trial] is made so
late and never heard until trial, it weakens all the other factors because they
are so dependent upon the assertion." Clarke v. State, 928 S.W.2d
709, 718 (Tex. App.--Fort Worth 1996, pet. ref'd) (op. on reh'g); see Haney,
977 S.W.2d at 643. For these reasons, we hold that the trial court did not err
in denying appellant's motion to dismiss based on the violation of appellant's
right to a speedy trial. Accordingly, appellant's fifth issue is overruled.
Legality of Appellant's
Arrest
In his first issue, appellant complains
that the trial court erred in denying his motion to suppress and overruling his
subsequent objection at trial because the wooden stick and drugs in this case
were seized incident to an illegal arrest.
Standard and Scope of Review
We review the denial of a motion to
suppress by giving almost total deference to a trial court's determination of
historical facts and reviewing de novo the court's application of the law. Carmouche
v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). When the trial court
does not make explicit findings of historical facts, we review the evidence in
the light most favorable to the trial court's ruling. Id. at 327-28. In
determining whether a trial court's decision is supported by the record, we
generally consider only evidence adduced at the suppression hearing because the
ruling was based on it rather than evidence introduced later. Rachal v.
State, 917 S.W.2d 799, 809 (Tex. Crim. App.), cert. denied, 519
U.S. 1043 (1996). However, this general rule is inapplicable where, as in this
case, the suppression issue has been relitigated by the parties during a trial
on the merits. See id.
Applicable Law
The Fourth Amendment protects against
unreasonable searches and seizures. U.S. Const. amend. IV. For an arrest to be
justified under the Fourth Amendment, it must be accompanied by probable cause
to believe that a person has engaged in or is engaging in criminal activity. Henry
v. United States, 361 U.S. 98, 102, 80 S. Ct. 168, 171 (1959). In most
cases, an officer should let a magistrate make the determination of whether
probable cause exists and obtain a warrant before an arrest is made. See
Randall v. State, 656 S.W.2d 487, 490 (Tex. Crim. App.1983); Throneberry
v. State, 72 S.W.3d 389, 393 (Tex. App.--Fort Worth 2002, pet. dism'd).
Warrantless arrests, however, may be reasonable under the Fourth Amendment if
the circumstances surrounding the arrest make it impracticable for a peace
officer to take the time to procure a warrant. See Smith v. State, 739
S.W.2d 848, 852 (Tex. Crim. App. 1987). In Texas, warrantless arrests are
authorized in specific situations that are set out in the code of criminal
procedure. See Tex. Code Crim. Proc. Ann. arts. 14.01-.06 (Vernon 1977
& Supp. 2002); Subia v. State, 836 S.W.2d 711, 713 (Tex. App.--El
Paso 1992, no pet.). For example, a peace officer in Texas may arrest a person
without a warrant if that person commits an offense in the officer's presence or
within the officer's view. See Tex. Code Crim. Proc. Ann. art.
14.01(b).
In reviewing a warrantless arrest to
determine the existence of probable cause, we look to the facts known to the
officer at the time of the arrest. Atkins v. State, 919 S.W.2d 770,
773-74 (Tex. App.--Houston [14th Dist.] 1996, no pet.). Whether
probable cause exists is determined by considering the totality of the
circumstances. See State v. Parson, 988 S.W.2d 264, 267 (Tex. App.--San
Antonio 1998, no pet.); Atkins, 919 S.W.2d at 773-74. In determining
whether the officers had probable cause to arrest appellant, this court must
determine whether the officers reasonably believed appellant committed an
offense in their presence, not whether the evidence is sufficient to convict
appellant of that offense. See Givens v. State, 949 S.W.2d 449, 451
(Tex. App.--Fort Worth 1997, pet. ref'd); see also 40 George E. Dix
& Robert O. Dawson, Texas Practice: Criminal Practice and Procedure § 9.51
n. 5 (2d ed. 2001) (noting that "[t]he [court of criminal appeals] has long
adopted the position that the validity of [an] arrest does not turn upon whether
the arresting officer was ultimately correct but rather upon whether he had
probable cause to believe that an offense was being committed").
Unlawful Carrying of a Weapon
Appellant complains that his warrantless
arrest was illegal, that is, not supported by probable cause, because the stick
is not an illegal weapon under chapter 46 of the penal code. Under that chapter,
a person commits an offense if he intentionally, knowingly, or recklessly
carries on or about his person a handgun, illegal knife, or club. Tex. Penal
Code Ann. § 46.02(a) (Vernon Supp. 2002). A "club" is defined in that
chapter as "an instrument that is specially designed, made, or adapted for
the purpose of inflicting serious bodily injury or death by striking a person
with the instrument." Id. § 46.01(1). Appellant specifically
contends that the wooden stick is not a "club" because it was not
"specially designed, made, or adapted" to cause serious bodily injury
or death. See id.
The wooden stick was admitted into
evidence at the suppression hearing. The stick is approximately an inch and a
half in diameter and eighteen inches in length. A hole is drilled through one
end with a loop made of string running through the hole. The wooden stick is
covered with visible scratches and marks, some deep, which appear to be animal
bite marks. Appellant testified at the suppression hearing and explained that he
used the stick when he trained his dogs--rottweilers and pit bulls. He would
throw the stick for the dogs to retrieve and would use the stick to play
"tug of war" with the dogs. Officer Morales testified that, in his
opinion, the string attached to the handle is an adaptation that makes the stick
a "club." He testified that a person could place a hand through the
string, grasp the stick, and strike at a person without losing control. Officer
Morales further testified that the wooden stick is capable of causing serious
bodily injury or death.
In Alexander v. State, the
defendant was prosecuted under section 46.02 for carrying a twelve-inch
motorcycle chain that had a nylon cord tied around the last link. 617 S.W.2d
269, 270 (Tex. Crim. App. [Panel Op.] 1981). In that case, the court of criminal
appeals stated:

 The fact that an object is capable of
 inflicting serious bodily injury or death alone does not bring the object
 within the definition of club set forth in [section] 46.01 . . . . As the
 practice commentary to [section] 46.02 . . . notes:
 
 "Instruments readily capable of
 inflicting serious injury but not specifically designed to do so, such as
 baseball bats and rolling pins, are excluded[;] if a person carrying one
 of them has intent to use them to inflict injury and his criminal design
 progresses far enough, however, he can be prosecuted for an attempted or
 completed assault . . . "
 
         In
 this case, there is absolutely no evidence that the appellant carried about
 his person an instrument specifically designed, made or adapted for the
 purpose of inflicting serious bodily injury or death. We cannot infer
 from the presence of the nylon cord alone that this "adaption" was
 accomplished for the specific purpose of inflicting serious bodily injury or
 death.

Alexander, 617 S.W.2d at 270
(first and third emphases added). In Coleman v. State, our sister court
in Dallas held that a hickory rod, similar in size and shape to the stick in
this case, that had a leather thong tied through the handle is not a
"club" under section 46.02. 790 S.W.2d 369, 370 (Tex. App.--Dallas
1990, no pet.).
Following Alexander and Coleman,
we cannot conclude that the wooden stick the officers saw lying on the seat of
appellant's truck is a "club" as defined in section 46.01 of the penal
code. The presence of the string is not a special adaptation for the purpose of
causing serious bodily injury or death. While the presence of the string might
make the stick easier to use for the purpose of inflicting injury or death, we
cannot conclude this adaptation was specifically for that purpose. See
Alexander, 617 S.W.2d at 270. The marks on the stick are clearly visible
even from a distance. In addition, the marks appear to have been created by a
sharp object or objects, such as animal teeth; we cannot see how the marks could
have resulted from striking a human. As a result, we hold that the officers in
this case could not have reasonably believed that appellant committed the
offense of unlawful carrying of a weapon and, thus, did not have probable cause
to arrest appellant for that offense.(2)
Assault
Although we have concluded that the
officers did not have probable cause to arrest appellant for unlawfully carrying
a weapon, our discussion cannot end here. In reviewing a trial court's decision
on a motion to suppress, appellate courts must affirm the decision if it is
correct on any theory of law that finds support in the record. Roquemore v.
State, 60 S.W.3d 862, 866 (Tex. Crim. App. 2001); Pettigrew v. State,
908 S.W.2d 563, 567 (Tex. App.--Fort Worth 1995, pet. ref'd). The State argues
that although the officers arrested appellant for committing the offense of
unlawful carrying of a weapon, the officers could have arrested appellant for
aggravated assault because he threatened the officers with the stick.
A person commits the offense of assault if
the person intentionally or knowingly threatens another with imminent bodily
injury. Tex. Penal Code Ann. § 22.01(a)(2) (Vernon Supp. 2002); Donoho v.
State, 39 S.W.3d 324, 328 (Tex. App.--Fort Worth 2001, pet. ref'd).
Aggravated assault occurs if the person commits an assault and uses or exhibits
a deadly weapon during the offense. Tex. Penal Code Ann. § 22.02(a)(2) (Vernon
1994); Donoho, 39 S.W.3d at 328.
Absent proof of sham or fraud, an arrest
that is unlawful for the offense for which a person was arrested is valid when
the crime for which the person was arrested and a crime the police had probable
cause to believe the person committed are closely related. Warrick v. State,
634 S.W.2d 707, 709 (Tex. Crim. App. [Panel Op.] 1982); Reynolds v. State,
902 S.W.2d 558, 560 (Tex. App.--Houston [1st Dist.] 1995, pet.
ref'd). For example, this court has held that an unlawful arrest for driving
while intoxicated was nevertheless valid because the officer had probable cause
to arrest the defendant for public intoxication. Jones v. State, 949
S.W.2d 509, 516 (Tex. App.--Fort Worth 1997, no pet.).
In this case, the arrest for unlawful
carrying of a weapon was based on appellant's possession of the stick. The
State's arguments in support of the arrest on the basis of aggravated assault
focus on appellant's use of the stick during the officers' investigation of his
possession of the stick. Accordingly, we believe that the two offenses are
closely related. Furthermore, there is no evidence of any "sham or
fraud" by the officers. Therefore, we will address the State's alternative
argument. However, because we hold that the officers had probable cause to
arrest appellant for the lesser-included offense of assault, we do not need to
address whether the officers had probable cause to believe the stick is a deadly
weapon. We will instead focus on whether the officers had probable cause to
believe that appellant intentionally or knowingly threatened either of them with
imminent bodily injury. See Tex. Penal Code Ann. § 22.01(a)(2).
A threat is not limited to a spoken intent
to do violence. McGowan v. State, 664 S.W.2d 355, 357 (Tex. Crim. App.
1984); Preston v. State, 675 S.W.2d 598, 601 (Tex. App.--Dallas 1984,
pet. ref'd), cert. denied, 474 U.S. 982 (1985). Threats may be
communicated by actions, speech, or conduct. McGowan, 664 S.W.2d at
357. A threat even may include an offer to use future force. See, e.g.,
Berry v. State, 579 S.W.2d 487, 489 (Tex. Crim. App. 1979); Hillburn
v. State, 627 S.W.2d 546, 548 (Tex. App.--Amarillo 1982, no pet.). The
focus of the offense of assault is whether the actor possessed the requisite
intent to threaten. Trevino v. State, 752 S.W.2d 735, 736-37 (Tex.
App.--Eastland), pet. dism'd, 759 S.W.2d 142 (Tex. Crim. App. 1988)
(citing Dues v. State, 634 S.W.2d 304, 305 (Tex. Crim. App. [Panel Op.]
1982)). It is insufficient to show that someone was frightened by the actor's
conduct. See Dues, 634 S.W.2d at 305; Trevino, 752 S.W.2d at
736-37; 6 Michael B. Charlton, Texas Practice: Criminal Law § 13.2 (2d ed.
2001); see also Williams v. State, 827 S.W.2d 614, 616 (Tex.
App.--Houston [1st Dist.] 1992, pet. ref'd) (comparing robbery
statute that requires "plac[ing]" another in fear with the assault
statute). Thus, there must at least be evidence of some overt conduct by the
defendant that suggests he acted with an intent to threaten.
The evidence relevant to our consideration
of whether appellant threatened the officers is evidence of appellant's actions
when he and the officers reached the truck. Officer Horton's relevant testimony
at the suppression hearing is as follows:

        
 [DEFENSE COUNSEL:] Is it your testimony that contrary to your commands
 [appellant] entered the vehicle?
        
 [HORTON:] Yes, sir.
        
 [DEFENSE COUNSEL:] And emerged with the stick in his hand?
        
 [HORTON:] Yes, sir.
        
 [DEFENSE COUNSEL:] Why did he do that? Can you tell us?
        
 [HORTON:] I have no idea.
        
 [DEFENSE COUNSEL:] Was he attempting to show you what the stick was for or
 explain what he said -
        
 [HORTON:] In my opinion he was attempting to come after me with the stick.
 [Emphasis added.]
 

At trial, Officer Horton testified:

        
 [PROSECUTOR:] . . . Explain to the jury what he did next.
        
 [HORTON:] He-he reaches for the handle and says, "Do you want me to get
 the club?"
 And I told him, "No, don't get
 in the vehicle."
        
 [PROSECUTOR:] Are you this close to him at this point?
        
 [HORTON:] I am probably closer than what you are, probably right there.
        
 [PROSECUTOR:] Probably about three feet away?
        
 [HORTON:] Yes, sir.
        
 [PROSECUTOR:] He wants to go in and get the club, and you are telling him no?
        
 [HORTON:] I told him no three times. I told him not to enter the vehicle.
        
 [PROSECUTOR:] What happens next?
        
 [HORTON:] I guess he flicked the alarm . . . . And the door flew open, the
 passenger door, and it looked like he dove in the vehicle. . . . I saw him
 grab the club, and at that point -
        
 [PROSECUTOR:] Go ahead and grab that club -
         [HORTON:]
 As soon as - he flings the door open, he jumps in and grabs the club like
 this.
        
 [PROSECUTOR:] And the door kind of swung out blocking you?
        
 [HORTON:] Yeah, blocking me.
         [PROSECUTOR:]
 Okay. What happens at this point?
        
 [HORTON:] Panic.
        
 [PROSECUTOR:] At this point were you afraid for your safety?
        
 [HORTON:] Yeah. At that point I couldn't understand what was going on because
 I saw the club, and it was like, what is he doing. It was like panic mode.
        
 [PROSECUTOR:] And he had the club in his hand?
        
 [HORTON:] Yes, sir.
        
 [PROSECUTOR:] Demonstrate that.
         [HORTON:]
 He takes the club and he's inside the vehicle with the club. Let me say this.
 At the time he's got the club like this, I'm already drawing my weapon because
 I know there is a weapon - I know there is a club in the car. He comes out
 of the vehicle like this with the club just like this.
        
 [PROSECUTOR:] What do you do at this time?
         [HORTON:]
 I am backing up and telling him to drop the club, and I have got my gun sights
 right on him.
        
 [PROSECUTOR:] In your opinion was he coming at you in a menacing manner?
        
 [HORTON:] In my opinion he was coming at me.


        
 . . . .


        
 [PROSECUTOR:] How many times did you have to tell him to drop [the stick]
 before he dropped it?
        
 [HORTON:] I believe I told him two or three times. I remember the
 first time and I remember I was walking back and shouting at him, "Drop
 the club."
        
 [PROSECUTOR:] At that point what happened?
        
 [HORTON:] As he walked forward I walked backward. He saw me with my
 gun pointed, and he dropped the club. [Emphasis added.]

When appellant opened the truck, Officer
Morales was standing near the back of the truck, calling in the license plate
number. At the suppression hearing, Officer Morales testified:

        
 [PROSECUTOR:] So I believe where you left it, Officer, [appellant] had opened
 the door - passenger lock with the remote control.
        
 [MORALES:] Right.
        
 [PROSECUTOR:] And then what happened?
        
 [MORALES:] Like I said, in an aggressive movement - I mean, within
 seconds, he entered the vehicle. And I recall as I was looking down
 calling in the plate Officer Horton then yelled, "Weapon, weapon,"
 and then I heard him saying, "Drop it."
        
 And when I looked up, all I remember seeing is [appellant] with the club in
 his right hand, and seemed like just seconds went by. He was still holding it,
 and Officer Horton was still telling him to drop it. Both Officer Horton and I
 had drawn our weapons.
        
 . . . .
        
 [MORALES:] In my mind I thought - I did not know what he was grabbing from
 behind the vehicle or, you know, if there was a gun.
        
 [PROSECUTOR:] But what you saw in [appellant's] hand was a club?
         MORALES:]
 A club.
         [PROSECUTOR:]
 Did he ever swing it at Officer Horton?
         [MORALES:]
 Never swung. He had it in his right hand.
         [PROSECUTOR:]
 Was it - I guess what I am driving at here, Officer, could you tell from his
 behavior whether he was going to swing it or just holding it up to show the
 officer that, "Hey, here it is," that type of thing? Did you know --
 could you tell from what you saw what his intent was?
        
 [MORALES:] In my opinion, he was probably thinking it was in the back of his
 mind if he could get away with it.
        
 . . . .
        
 [MORALES:] But to answer your question I don't know what he was thinking.
 
 [PROSECUTOR:] But -
 
        
 [MORALES:] If he grabbed - a normal person would probably grab it and drop it
 immediately.
        
 [PROSECUTOR:] So he was told to drop the club?
 
 [MORALES:] Correct.
 
        
 [PROSECUTOR:] On one or more than one occasion?
        
 [MORALES:] More than one occasion.
        
 . . . .
         [PROSECUTOR:]
 . . . . And you both had your weapons trained on him?


 
 [MORALES:] Correct.
 
        
 [PROSECUTOR:] Were you prepared to shoot had he made any aggressive move
 toward any of you?
        
 [MORALES:] Yes. [Emphasis added.]

At trial, Officer Morales offered similar
testimony:

        
 [PROSECUTOR:] . . . . So can you demonstrate - where is the club? Can you
 demonstrate to the jury how [appellant] was holding that club at the time?
        
 [MORALES:] If you can picture this being the pickup truck, the door swinging
 open this way, he had the club in his hand like this with Officer Horton
 directly in front of him at an angle, and I was directly behind him.

He was ordered to drop the weapon two or
three times, and two or three seconds, as I remember, went by with him still
having the club like this. He then dropped the weapon.

        
 [PROSECUTOR:] Did you take his position with the club to be menacing in
 any way?
         [MORALES:]
 I did.
        
 [PROSECUTOR:] Were you in fear for your own safety or the safety of Officer
 Horton?
        
 [MORALES:] I was. [Emphasis added.]

On cross-examination, defense counsel
asked Officer Morales:

        
 [DEFENSE COUNSEL:] . . . [Y]ou say that . . . [appellant] . . . opened . .
 . one of the doors and reached in and went into the truck and came out with
 this club in a threatening manner. Is that your testimony?
 [MORALES:] Yes, it is. [Emphasis
 added.]

At the conclusion of the suppression
hearing, the trial judge stated that he felt appellant entered the truck and
"came out with the instrument in question in a threatening manner according
to [the officers'] testimony." Thus, it appears from the judge's statements
that he believed the officers had probable cause to arrest appellant for
threatening the officers rather than for the offense of unlawful carrying of a
weapon. The evidence shows that appellant entered the truck after the officers
repeatedly told him not to, advanced toward Officer Horton with the stick in his
hand, and did not drop the stick immediately when repeatedly ordered to do so.
Although Officer Morales indicated that he was unsure of appellant's intentions,
Officer Horton stated that he thought appellant was "coming after him with
the stick."
The record contains several references to
the officers' demonstrations of the manner in which appellant was holding the
stick but no descriptions of the demonstrations. We cannot determine from the
record how appellant was holding the stick when he walked toward Officer Horton.
The trial judge was in the best position of being able to judge the credibility
and demeanor of the witnesses, and he found that appellant's manner was
threatening. Accordingly, we hold that on the facts of this case, the officers
had a reasonable belief that appellant committed assault in their presence and,
thus, had probable cause to arrest appellant.
Because the officers had probable cause to
arrest appellant for assault, their warrantless arrest of appellant was valid. See
Tex. Code Crim. Proc. Ann. art. 14.01(b). Accordingly, the trial court did not
abuse its discretion in denying appellant's motion to suppress. Appellant's
first issue is overruled.
Miranda Warnings
In his third issue, appellant claims that
the trial court erred in overruling his motion to suppress and motion for
directed verdict because the officers obtained evidence that appellant owned the
stick in violation of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602
(1966), and Texas Code of Criminal Procedure article 38.22. Tex. Code Crim.
Proc. Ann. art. 38.22 (Vernon 1979 & Supp. 2002). To preserve a complaint
for our review, a party must have presented to the trial court a timely request,
objection, or motion that states the specific grounds for the desired ruling if
they are not apparent from the context of the request, objection, or motion.
Tex. R. App. P. 33.1(a)(1); Mosley v. State, 983 S.W.2d 249, 265 (Tex.
Crim. App. 1998) (op. on reh'g), cert. denied, 526 U.S. 1070 (1999).
Further, the trial court must have ruled on the request, objection, or motion,
expressly or implicitly, or refused to rule, and the complaining party objected
to the refusal. Tex. R. App. P. 33.1(a)(2); Taylor v. State, 939 S.W.2d
148, 155 (Tex. Crim. App. 1996). Even constitutional error can be waived. Wright
v. State, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000), cert. denied,
531 U.S. 1128 (2001).
Here, appellant's motion to suppress did
not allege that appellant's statements that he owned the stick were obtained in
violation of Miranda and article 38.22. During trial counsel's closing
arguments at the suppression hearing and trial, he argued that one of the
reasons appellant's arrest was illegal was because the officers did not give
appellant Miranda warnings before appellant told them he owned the
stick. But, he did not object at trial or during the hearing on the motion to
suppress when the officers testified that appellant told them the stick was his.
Consequently, we hold that appellant did not preserve this issue for our review.
See Tex. R. App. P. 33.1(a)(1). We overrule appellant's third issue.
Legal Sufficiency
In his second issue, appellant complains
that the trial court erroneously overruled his motion for directed verdict
because the State failed to prove at trial that the arrest was valid. We have
already held that the arrest was lawful; we therefore overrule appellant's
second issue.
At oral argument, we granted appellant
leave to file a supplemental brief further challenging the legal sufficiency of
the evidence. In his supplemental brief, appellant complains that the evidence
was legally insufficient to prove the drugs were in his possession and to tie
the stick to the possession offense.
In reviewing the legal sufficiency of the
evidence to support a conviction, we view all the evidence in the light most
favorable to the verdict. Cardenas v. State, 30 S.W.3d 384, 389-90
(Tex. Crim. App. 2000); Narvaiz v. State, 840 S.W.2d 415, 423 (Tex.
Crim. App. 1992), cert. denied, 507 U.S. 975 (1993). The critical
inquiry is whether, after so viewing the evidence, any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt. McDuff
v. State, 939 S.W.2d 607, 614 (Tex. Crim. App.), cert. denied, 522
U.S. 844 (1997). This standard gives full play to the responsibility of the
trier of fact to resolve conflicts in the testimony, to weigh the evidence, and
to draw reasonable inferences from basic facts to ultimate facts. Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).
Appellant has been convicted of possession
of a controlled substance. Possession is defined as actual care, custody,
control, or management. Tex. Health & Safety Code Ann. § 481.002(38)
(Vernon Supp. 2003). Possession may be proved by circumstantial evidence, as
long as the evidence affirmatively links the accused to the offense such that it
may be inferred that the defendant knew of the contraband's existence and
exercised control over it. McQuarters v. State, 58 S.W.3d 250, 259
(Tex. App.--Fort Worth 2001, pet. ref'd). Evidence that is relevant to establish
this "affirmative link" includes but is not limited to: (1) the
defendant's presence when the contraband was discovered; (2) whether the
contraband was in plain view; (3) the defendant's proximity to and the
accessibility of the narcotics; (4) whether the defendant was under the
influence of narcotics when arrested; (5) whether the defendant possessed other
contraband or narcotics when arrested; (6) whether the defendant made
incriminating statements when arrested; (7) whether the defendant attempted to
flee; (8) whether the defendant made furtive gestures; (9) whether there was an
odor of the contraband; (10) whether other contraband or drug paraphernalia were
present; (11) whether the defendant owned or had the right to possess the place
where the drugs were found; (12) whether the place where the drugs were found
was enclosed; (13) whether the defendant was the driver of the automobile in
which the contraband was found; (14) whether the defendant was found with a
large amount of cash; and (15) whether the conduct of the defendant indicated a
consciousness of guilt. Id.; Pettigrew, 908 S.W.2d at 571.
In this case, the record is replete with
evidence that the truck in which the drugs were found belonged to appellant.
Appellant admitted to the officers that he had driven the truck to the parking
lot where the search was conducted. The drugs were found in an enclosed space,
the passenger compartment of appellant's truck, which he admitted having control
over. The bottle containing the drugs was found behind the driver's seat of the
single-cab truck, a location that would not have been readily accessible to any
passenger of the truck. No evidence was introduced at trial suggesting that
appellant's companion had been in the truck or had any connection with the
drugs. Finally, when the officers approached appellant, before they asked any
questions, he told them that he did not have any drugs. This is some evidence of
a guilty conscience on the part of appellant. Viewing the evidence in a light
most favorable to the jury's verdict, we believe it is legally sufficient to
support appellant's conviction for possession of a controlled substance.
Appellant's supplemental brief also raises
the issue of the legal sufficiency of the jury's deadly weapon finding in
connection with the possession offense.3)  A
deadly weapon finding is a finding: (1) that a deadly weapon was used or
exhibited during the commission of, or immediate flight from, a felony; and (2)
that the defendant used or exhibited that deadly weapon or, as a party to the
offense, knew that weapon would be used or exhibited. Tex. Code Crim. Proc. Ann.
art. 42.12, § 3g(a)(2). Section 1.07(a)(17) of the penal code defines a deadly
weapon as:

        
 (A) a firearm or anything manifestly designed, made, or adapted for the
 purpose of inflicting death or serious bodily injury; or
        
 (B) anything that in the manner of its use or intended use is capable of
 causing death or serious bodily injury.

Tex. Penal Code Ann. § 1.07(a)(17)
(Vernon 1994).
It is clear that the stick in this case is
not a deadly weapon per se under section 1.07(a)(17)(A). See Thomas v. State,
821 S.W.2d 616, 619-20 (Tex. Crim. App. 1991) (noting phrase "deadly weapon
per se" means an object that meets definition in 1.07(a)(17)(A)); Taylor
v. State, 859 S.W.2d 466, 468 (Tex. App.--Dallas 1993, no pet.) (stating
that a sawed-off hardwood axe handle approximately eighteen to twenty-four
inches long is not a deadly weapon per se); Granger v. State, 722
S.W.2d 175, 176 (Tex. App.--Beaumont 1986, pet. ref'd) (noting that stick three
and a half or four feet long and two inches in diameter is not a deadly weapon
per se). Further, we have already concluded that the stick in this case is not a
"club" and, thus, is not "specially designed, made, or
adapted" for the purpose of inflicting serious bodily injury or death. See
Tex. Penal Code Ann. § 46.01(1). Consistent with that conclusion, we also
conclude the stick in this case does not fall within the substantially similar
definition of deadly weapon found in section 1.07(a)(17)(A).
An object that does not fall within
section 1.07(a)(17)(A) can qualify as a deadly weapon through the manner of its
use or intended use under subsection (B). Hammons v. State, 856 S.W.2d
797, 800 (Tex. App.--Fort Worth 1993, pet. ref'd). Under section 1.07(a)(17)(B),
an "object is a deadly weapon if the actor intends a use of the object in
which it would be capable of causing death or serious bodily injury." McCain
v. State, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). In deadly weapon cases
involving knives, the court of criminal appeals has held that evidence of the
appellant's verbal threats, the distance between the appellant and the victim,
and the witnesses' descriptions of the instrument are all relevant in
determining whether the evidence is legally sufficient to support a finding that
the appellant intended to use the instrument in a manner capable of causing
death or serious bodily injury. Brown v. State, 716 S.W.2d 939, 946
(Tex. Crim. App. 1986). In addition, while the State is not required to
introduce expert testimony to prove that the intended use of an object is
capable of causing death or serious bodily injury, it may be "particularly
useful in supplementing meager evidence on the issue." Davidson v.
State, 602 S.W.2d 272, 273 (Tex. Crim. App. [Panel Op.] 1980).
In this case, Officer Horton testified at
trial that in his opinion as a police officer, the stick and similar objects are
capable of causing serious bodily injury or death and the way appellant used the
stick on the night the officers arrested him could have caused serious bodily
injury or death. In addition, Officer Morales agreed that the stick is an object
that in the manner of its use or intended use is capable of causing death or
serious bodily injury. However, this testimony is not sufficient to establish
that the stick is a deadly weapon. Officer Horton did not testify that appellant
intended a use of the stick that is capable of causing death or serious bodily
injury. And, given the remainder of the officers' testimony in this case, we
cannot agree that appellant's grabbing the stick, exiting the truck in a
threatening manner, walking toward Officer Horton with the stick in his hand,
and stopping about three feet away from Officer Horton is a use of the stick
that is capable of causing death or serious bodily injury.
Because appellant did not use the stick in
a manner capable of causing death or serious bodily injury, we must determine
whether the evidence is sufficient to prove that appellant intended to use the
stick in a manner capable of causing serious bodily injury or death. There is no
such evidence in the record. Appellant made no verbal threats to the officers.
Although appellant approached Officer Horton while holding the stick, according
to Officer Morales's testimony, he was standing about the length of the bed of a
pickup truck away from Officer Horton when he dropped it. In addition, Officer
Morales testified that appellant did not swing the stick at Officer Horton, nor
is there any evidence in the record that appellant brandished the stick in any
way. While there is evidence that appellant's manner of exiting the truck and
holding the stick was threatening, there is no evidence that the nature of the
threat was to inflict serious bodily injury or death. At most, the evidence
raises a reasonable inference that appellant intended to scare the officers
away. Furthermore, while Officers Horton and Morales testified that they were
afraid for their safety, they did not testify that they were afraid appellant
would cause them serious bodily injury or death.
Appellant correctly concedes that the
stick is capable of causing death or serious bodily injury. However, we agree
with appellant that even after viewing the evidence in the light most favorable
to the verdict, a rational trier of fact could not find that the State proved
beyond a reasonable doubt that appellant intended to use the stick in a manner
that would cause serious bodily injury or death.(4) 
Thus, the evidence is legally insufficient to support the jury's deadly weapon
finding. We sustain the portion of appellant's additional issue that complains
of the legal sufficiency of the evidence to support the jury's deadly weapon
finding, but overrule the portion contending that the evidence was insufficient
to prove he possessed the drugs.
CONCLUSION
Having sustained the portion of
appellant's subissue challenging the deadly weapon enhancement, we reform the
trial court's judgment to delete the deadly weapon finding and affirm the
judgment as reformed.
 
                                                           
TERRIE LIVINGSTON
                                                           
JUSTICE
PANEL B: LIVINGSTON, DAUPHINOT, JJ; and
DAVID L. RICHARDS, J. (Sitting by Assignment).
DO NOT PUBLISH
Tex. R. App. P. 47.2(b)
DELIVERED: March 24, 2003

1.  In the second indictment, appellant was charged
with possession of a controlled substance with intent to deliver. The remaining
indictments added various enhancement and habitual offender paragraphs.
2.  Because we have decided that the officers did not
have probable cause to arrest appellant for unlawful carrying of a weapon, we do
not need to address appellant's fourth issue, concerning a defense that
appellant engaged in a "lawful sporting activity." See Tex.
Penal Code Ann. § 46.15(b)(4) (Vernon Supp. 2002); Tex. R. App. P. 47.1.
3.  Appellant states in his brief that "there is
no affirmative link between the possession of drugs and any alleged prohibited
weapon, the dog stick in this case." We construe this statement as a
challenge to the legal sufficiency of the deadly weapon finding. See
Tex. R. App. P. 38.9 (briefing rules to be construed liberally; therefore,
substantial compliance with rules is sufficient); cf., e.g., Harris
v. State, 994 S.W.2d 927, 933 (Tex. App.--Waco 1999, pet. ref'd) (stating
that "the concept of no 'affirmative links' has been used to determine the
sufficiency of the evidence for [drug] possession convictions").
4.  While this result may appear inconsistent with
our prior holding that the arrest was lawful, we note that the difference is a
result of the less stringent standard of review used to determine probable
cause.