## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-KA-01950-SCT

*ANTHONY WAYNE MURRAY*

*v.*

*STATE OF MISSISSIPPI*

DATE OF JUDGMENT:           08/22/2006
TRIAL JUDGE:                HON. MICHAEL M. TAYLOR
COURT FROM WHICH APPEALED:  LINCOLN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     JASON E. TATE
ATTORNEYS FOR APPELLEE:     OFFICE OF THE ATTORNEY GENERAL
                            BY: W. GLENN WATTS
DISTRICT ATTORNEY:          DEE BATES, JR.
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 11/08/2007
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE SMITH, C.J., GRAVES AND RANDOLPH, JJ.

### RANDOLPH, JUSTICE, FOR THE COURT:

¶1.     On April 9, 2004, Anthony Wayne Murray ("Murray") was arrested in Lincoln County, Mississippi, and cited for possession of beer, DUI (third or subsequent conviction), and driving with a suspended license. On August 22, 2006, Murray was tried in the Circuit Court of Lincoln County and found guilty by a jury of felonious operation of a motor vehicle while under the influence of intoxicating liquor. As a habitual offender, Murray was sentenced to five years in the custody of the Mississippi Department of Corrections ("MDOC") "to be served day for day." After Murray's "Motion for Judgment Notwithstanding the Verdict, or in the alternative, for a New Trial" was denied, he filed this

appeal. Murray asserts the circuit court erred in denying his "Motion to Dismiss for Lack of Speedy Trial," and insufficient evidence was presented to support his conviction (specifically, that he was driving or otherwise operating the truck).

**FACTS**

¶2.    On April 9, 2004, Murray began drinking alcoholic beverages at approximately 5:00 p.m. Upon arriving at a pool hall in Summit, Mississippi, with his brother and sister-in-law, Murray realized he had forgotten his wallet. Murray testified that his cousin, Emmett Ervin ("Peanut"), was also at the pool hall and offered to "take me to get my billfold, and we was coming right back. In the meantime, we decided to go out to Kathy's house."[1] According to Kathy Carr, Murray's present girlfriend,[2] Murray and Peanut arrived at her home in Murray's truck and invited her to join them at a different pool hall, Armstrong's. Carr accepted the invitation and "asked Peanut to let [her] drive because he was already drunk, and [she] had [her] license, [but] he wouldn't let [her] drive." Therefore, Carr decided to follow Murray and Peanut in her own vehicle.

¶3.    According to Murray, after shooting pool at Armstrong's "for I don't know how long . . . we left [and] . . . headed out to Sandra's house . . . my girlfriend at the time." Murray

---

[1]Peanut died on November 19, 2005. Linda Ervin ("Ervin"), Peanut's wife, testified that Peanut had been home with her the entire evening of April 9, 2004, and had not gone to the pool hall.

[2]Carr testified that she was not Murray's girlfriend on April 9, 2004.

testified that Peanut drove toward Sandra's house.[3] Carr testified that Peanut was driving and Murray was in the passenger seat when they left Armstrong's.

¶4.    A witness for the prosecution, Chasity Falvey, testified that she was driving "through downtown Summit where the residential area is, [and] there was [a] vehicle in front of us, and he was driving in the opposite lane of traffic, he was passing cars on . . . double yellow lines and . . . a few people had to get off the edge of the road to get out of his way."  In approaching within four car lengths of Murray's truck, Falvey observed only one individual inside.  Falvey attempted to call 911, but failed to acquire cell phone service.  She lost sight of the truck.

¶5.    Subsequently, Murray's truck veered off the road and struck a tree.  According to Murray, "[e]vidently I fell asleep or something on the way [to Sandra's home] because I don't remember much more after that."  Soon thereafter, Falvey arrived and noticed "beer cans strewn all out in the road.  There were two ice chests out in the road behind the truck."  Falvey ran to the truck, and initially did not observe any occupants until she "lifted up the air bag, and that's when I saw [Murray] down in the floorboard of the truck[,]" under the steering wheel on the driver's side.  Fearing that Murray was dead, Falvey called 911, having successfully acquired cell phone service.  When Falvey attempted to take Murray's pulse, he looked up at her and began climbing out of his truck against her protests.  According to Falvey, "I said, 'Well, the ambulance and the sheriff's department will be here in just a

---

[3]According to Murray, he was not driving his truck "[b]ecause I was drinking[,]" and had been drinking continuously from 5:00 p.m. until approximately 11:00 p.m.

minute.' And he said, 'Oh, no, no, no . . . I've got to leave. I've got to go.'" Falvey testified that Murray was the only person at the scene when she arrived.

¶6.     Falvey testified that Murray had the scent of alcohol on his breath and said in a slurred fashion "that someone else was with him in the truck. And I repeatedly asked him who it was, and he never could give me a name. And so the first responders were walking out . . . through the woods to make sure no one had been thrown out of the vehicle . . . ." While the first responders were searching, Falvey testified that she asked Murray "point blank was he driving the vehicle, and he told me *yes*, he was." (Emphasis added).

¶7.     At approximately 11:15 p.m., Deputy Robert Jason Cole of the Lincoln County Sheriff's Department arrived at the scene. Deputy Cole testified that "Murray was outside . . . the ambulance talking with some ambulance personnel. When I walked up and spoke to [Murray] I . . . could smell the strong odor of intoxicating beverage about his person and on his breath when he spoke to me." Deputy Cole concluded that Murray had been driving the truck under the influence based upon the scent of alcohol on his breath, the presence of open beer cans, the statement of Falvey, and the fact that "there was nobody else at the scene that could have possibly been driving."[4]

¶8.     Deputy Howard Chandler of the Lincoln County Sheriff's Department arrived approximately ten minutes later. Upon arrival, Deputy Chandler observed that a "small Dodge truck" had "hit a tree. There were several open and empty and full . . . Budweiser cans laying around the vehicle and scattered in the road and inside the vehicle." He likewise

---

[4]Deputy Cole additionally testified that he never heard Murray assert that another individual had been driving the truck.

4

concluded that Murray was the driver based upon "the witness statements[,]" the fact that Murray was the only occupant at the scene, "[a]nd by the smell of an intoxicant coming from his breath and by the smell of an intoxicant coming from the vehicle and all . . . the full and empty beer cans or bottles in the road and in the vehicle."[5] Moreover, Deputy Chandler testified that at the jail later that evening, Murray admitted to driving the truck. Murray was arrested and cited for possession of beer, DUI (third or subsequent conviction),[6] and driving with a suspended license. Thereafter, Deputy Cole transported Murray to Kings Daughters Hospital in Brookhaven. Ervin testified that in the early morning hours of April 10, 2004, Peanut received a phone call from the hospital regarding the accident. She testified that Peanut was in no way involved in the accident.

¶9.     At the hospital, Murray initially refused to sign the consent form for having his blood drawn but, according to Deputy Cole, then gave verbal consent after Deputy Cole read the consent form to him. In contrast, Murray testified that "I know I didn't give them no permission [to draw blood], not verbal or signed." At approximately 1:00 a.m. on April 10,

_____

[5]Deputy Chandler had no recollection of Murray calling out in the surrounding woods for the alleged driver.

[6]Murray had pleaded guilty to the felonious operation of a motor vehicle while under the influence of intoxicating liquor on three prior occasions. Specifically, on February 23, 1999, Murray pleaded guilty to the felonious operation of a motor vehicle while under the influence of intoxicating liquor in Cause No. 98-077-KA in the Circuit Court of Pike County, Mississippi. As a result, Murray was sentenced to serve a term of five years in the custody of the MDOC. Thereafter, on August 15, 2000, Murray pleaded guilty to the felonious operation of a motor vehicle while under the influence of intoxicating liquor in Cause Nos. 00-445-KA and 00-446-KA in the Circuit Court of Pike County. In each of these causes, Murray was sentenced to serve a term of four years in the custody of the MDOC, to run concurrently with the alternative cause "and the remainder of the sentence imposed against [him] in Cause No. 98-077-KA."

5

2004, medical laboratory technician Sheron Buckner received a blood specimen kit from Deputy Cole and performed the blood collection procedure on Murray. The blood tubes were then sealed by Buckner in the presence of Deputy Cole and placed in a container with a security seal label initialed by them both. According to Deputy Cole, that container was then placed into a box which was sealed before he left the hospital. At the conclusion of his shift, Deputy Cole submitted the box to Captain Steve Rushing of the Lincoln County Sheriff's Department. Murray was released later that morning by posting bond.

¶10. On June 10, 2004, Captain Rushing submitted Murray's blood specimen kit to the Mississippi Crime Laboratory. Carmen McIntire, a forensic toxicologist with the Mississippi Crime Laboratory, obtained custody of the sealed blood specimen kit on June 16, 2004. Based upon her June 18, 2004, examination, McIntire determined that Murray's blood alcohol level was 0.22%, well above the 0.08% legal limit. According to McIntire, Murray's blood specimens were disposed of on June 16, 2005, consistent with the policy of the toxicology section.

¶11. Murray was first indicted for the April 9, 2004, offense on August 3, 2004.[7] On January 31, 2005, Murray was arraigned for the April 9, 2004, offense, but on February 17, 2005, the State filed a motion to *nolle prosequi*, which specifically stated that the State would seek re-indictment at the very next session of the Grand Jury. An order of *nolle prosequi* was

---

[7]According to Murray, he "bonded out that same day." While out on bond, on December 4, 2004, Murray once again endangered the public by driving under the influence and was arrested in Lincoln County and was cited for felony DUI, careless driving, possession of beer, driving with a suspended license, no insurance, and DUI (third or subsequent conviction), and was released again by posting bond.

entered on February 22, 2005. On March 4, 2005, Murray was re-indicted for "wilfully, unlawfully and feloniously operat[ing] a motor vehicle in Lincoln County . . . at a time when he . . . was under the influence of intoxicating liquors on two (2) previous occasions within the last five (5) years . . . contrary to and in violation of Section 63-11-30 of the Mississippi Code of 1972 . . . ." That same day, an arrest warrant was issued for Murray. On April 1, 2005, a National Crime Information Center ("NCIC") entry on Murray was filed.[8]

¶12.    On March 31, 2006, Murray was arrested by the Jackson County Sheriff's Department following a routine traffic stop.[9] Although he was employed by an electrical contractor at a Gulf Coast casino and was living on the coast at the time of his arrest, Murray told the booking officer that his residence was in Pike County. Following extradition to Lincoln County,[10] Murray filed his "Waiver of Arraignment" in the circuit court on April 3, 2006. Murray was released nine hours later by posting a $5,000 bond.[11]

---

[8]According to Major Dustin Barfield of the Lincoln County Sheriff's Department, "[i]t's our general policy that we notify the bondsmen and that we attempt to locate here in Lincoln County before we enter them on NCIC[,]" and Murray would not have been placed on NCIC had he been found in Lincoln County. While Major Barfield admitted that the Lincoln County Sheriff's Department had a Pike County address for Murray in its booking computer, he stated that they did not check that address because it was located in a neighboring jurisdiction.

[9]Murray was arrested after a "hit confirmation" on NCIC which Major Barfield testified was the first "hit confirmation" on Murray since his placement on NCIC.

[10]According to Murray, he was fired "[b]ecause I had to stay in jail for about four days before I could get back [to Lincoln County] to bond out again, and [I] missed too many days, so they terminated me."

[11]According to Murray, "I was bonded out the first time with Griffith Bonding, and they went out of business, and I didn't even realize it, and then I just had to bond out again. They wouldn't let me out on the same bond."

7

¶13.   On June 26, 2006, Murray filed a "Motion to Dismiss for Lack of Speedy Trial" arguing that "[t]he State's delay in bringing [him] to trial exceeds the eight month delay determined to be 'presumptively prejudicial' and the State does not have a valid reason to justify this delay." In a hearing on Murray's motion to dismiss that same day, Murray contended that he suffered prejudice by having to pay for another bond on April 3, 2006, and losing his job. However, he admitted to being aware that when the original indictment was *nolle prossed* on February 22, 2005, of the State's intention to re-indict him before the following Grand Jury. In denying Murray's motion to dismiss, the circuit court found that:

> far from being in a posture to assert his right to a speedy trial . . . [Murray] was not arraigned until . . . January 31[st] of 2005. Within a month of arraignment, the case had been dismissed and then shortly thereafter was reindicted. . . . [T]he delay in proceeding on 05-087 was obviously occasioned by the absence of [Murray]. . . . [T]he State is not responsible for providing a speedy trial for a Defendant who's not surrendered himself or been surrendered to the State's custody. Without the presence of [Murray], nothing could happen on Cause No. 05-087. . . . [E]ven with the passage of the time, there's no allegation of prejudice so much as an allegation of hardship and inconvenience which is a different thing from prejudicing the defense of a case. . . . [T]he Court finds that the delay has not been unreasonable, that . . . Cause No. 04-217 was dismissed shortly after arraignment, in fact, before the omnibus date set in that case, and the case was reindicted shortly thereafter. Delay simply [being] that [Murray] wasn't here.

¶14.   On July 18, 2006, the State filed a "Motion to Amend Indictment to Allege Habitual Status" asserting that Murray "is a habitual criminal inasmuch as he has been convicted at least twice previously of felonies upon charges separately brought and arising out of separate incidents at different times and for which felonies he was sentenced to separate terms of one year or more . . . ." Relying upon Murray's guilty pleas in Cause Nos. 00-445-KA and 00-446-KA in the Circuit Court of Pike County, the circuit court granted the State's motion.

8

¶15.   On August 22, 2006, the jury trial commenced.  After the State rested, Murray moved for a directed verdict, arguing that "the State has failed to make a prima facie case against [Murray] as to if he was driving the vehicle[,]" which was overruled.[12]  A jury found Murray guilty of felonious operation of a motor vehicle while under the influence of intoxicating liquor.  At the sentencing hearing, the circuit court concluded that:

> having previously entered the jury's verdict of guilty and having previously granted the State's Motion to Amend the Indictment to allege habitual status[, this court] sentences [Murray] according to the statute as an habitual offender to the statutory penalty of five years to serve in the custody of the [MDOC] to be served day for day.[13]

¶16.   On August 31, 2006, Murray filed a "Motion for Judgment Notwithstanding the Verdict, or in the alternative, for a New Trial" arguing, in part, that:

> 2.  The trial court erred by failing to grant [Murray's] motion for a directed verdict at the close of the State's case-in-chief.
>
> 3.  The trial court erred by failing to grant [Murray's] renewed motion for a directed verdict at the conclusion of [Murray's] case-in-chief. . . .
>
> 6.  The evidence presented by the State was insufficient to support the jury's verdict.
>
> 7. [Murray] was denied due process when a blood sample was drawn without [Murray] being advised of his right to refuse the test and without his written consent or without the benefit of a search warrant.

The circuit court denied Murray's post-trial motion.  Murray filed a timely notice of appeal.

---

[12]Murray renewed his motion for directed verdict after resting and after the State rested finally.  Both motions were overruled.

[13]Additionally, a $2,500 fine, $1,000 in court-appointed attorney's fees, and court costs were imposed upon Murray.

9

¶17.    This Court will consider:

(I) Whether Murray was denied due process when the circuit court denied his motion to dismiss for lack of speedy trial.
(II) Whether there was sufficient evidence to support Murray's conviction.

**ANALYSIS**

**I. Whether Murray was denied due process when the circuit court denied his motion to dismiss for lack of speedy trial.**

¶18.    This Court has stated that the:

[r]eview of a speedy trial claim encompasses the fact question of whether the trial delay rose from good cause. Under this Court's standard of review, this Court will uphold a decision based on *substantial, credible evidence*. If no probative evidence supports the trial court's finding of good cause, this Court will ordinarily reverse.

***DeLoach v. State***, 722 So. 2d 512, 516 (Miss. 1998) (emphasis added).

**A. Statutory Right**

¶19.    Mississippi Code Annotated Section 99-17-1 states that, "[u]nless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days *after the accused has been arraigned*." Miss. Code Ann. § 99-17-1 (Rev. 2007) (emphasis added). Murray inartfully suggests that this Court should consider the January 31, 2005, arraignment of the *nolle prossed* case as the applicable arraignment date. Should this Court concede this earlier arraignment date, which we do not, the time between that arraignment and the commencement of the jury trial on August 22, 2006, was 568 days. However, "[i]f the defendant is the cause of the delay, he cannot complain thereafter." ***Simmons v. State***, 678

10

So. 2d 683, 685 (Miss. 1996) (quoting ***Reed v. State***, 506 So. 2d 277, 281 (Miss. 1987)). *See also* ***Herring v. State***, 691 So. 2d 948, 955 (Miss. 1997) ("[a] defendant should not be allowed to control the justice system to his advantage."). Therefore, any delay attributable to Murray would toll the running of the 270-day statutory period. *See id*. at 953. On March 4, 2005, Murray was re-indicted, an event which he admittedly expected, and an arrest warrant was issued. Murray was not located until his arrest in Jackson County on March 31, 2006. Like the circuit court, this Court attributes that delay to Murray, as he failed to surrender himself to the State's custody. Therefore, the 270-day period was tolled during that time. *See id*. Under Murray's suggested timeline, only 176 days elapsed between that arraignment and the trial, which would be attributed to the State.

¶20. However, a proper analysis applies the actual date of arraignment after re-indictment. Following Murray's re-indictment on March 4, 2005, he filed a "Waiver of Arraignment" on April 3, 2006, after being extradited to Lincoln County. Between his "Waiver of Arraignment" on April 3, 2006, and the commencement of the jury trial on August 22, 2006, only 141 days passed. Therefore, the circuit court's denial of Murray's statutory speedy-trial claim was supported by "substantial, credible evidence." ***DeLoach***, 722 So. 2d at 516.

### B. Constitutional Right

#### 1.

¶21. The constitutional right to a speedy trial exists separately from the statutory right. *See* ***Simmons***, 678 So. 2d at 686. The Sixth Amendment to the United States Constitution states, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. In ***Klopfer v. North Carolina***, 386

11

U.S. 213, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967), the United States Supreme Court held that the right to a speedy trial is "'fundamental' and is imposed by the Due Process Clause of the Fourteenth Amendment on the States." *Barker v. Wingo*, 407 U.S. 514, 515, 92 S. Ct. 2182, 2184, 33 L. Ed. 2d 101, 108 (1972) (quoting *Klopfer*, 386 U.S. at 223).

¶22. In *Barker*, the United States Supreme Court created a "balancing test" which:

> necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: [l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

*Barker*, 407 U.S. at 530. Regarding this "balancing test," *Barker* states:

> [w]e regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, *they are related factors and must be considered together with such other circumstances as may be relevant.* In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive *balancing process.* But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

*Id*. at 533 (emphasis added). *See also* **Herring**, 691 So. 2d at 955 ("[t]he weighing of the *Barker* factors is not a mechanistic weighing. We must look at the totality of the circumstances.").

¶23. The following timeline summarizes relevant events for purposes of Murray's constitutional speedy trial claim:

| | |
|---|---|
| 4/9/04: | Murray initially arrested |
| 4/10/04: | Murray released on bond |
| 8/3/04: | Indictment |
| 1/31/05: | Arraignment |
| 2/22/05: | State *nolle prosequi*'s the 8/3/04 indictment as defective |

| | |
|---|---|
| 3/4/05: | Re-indictment |
| 3/4/05: | Arrest warrant issued for Murray |
| 3/31/06: | Murray arrested by Jackson County Sheriff's Department |
| 4/3/06: | Murray extradited to Lincoln County; files "Waiver of Arraignment;" and is released on bond |
| 6/26/06: | Murray files "Motion to Dismiss for Lack of Speedy Trial" |
| 6/26/06: | Hearing on Murray's "Motion to Dismiss for Lack of Speedy Trial" |
| 8/22/06: | Commencement of jury trial |

"For constitutional purposes, the defendant's right to a speedy trial attached at the *time of arrest*." ***Atterberry v. State***, 667 So. 2d 622, 626 (Miss. 1995) (citations omitted) (emphasis added). "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is *presumptively prejudicial*, there is no necessity for inquiry into the other factors that go into the balance." ***Barker***, 407 U.S. at 530 (emphasis added). This Court has previously stated "that any delay of *eight (8) months or longer* is *presumptively prejudicial*." ***Noe***, 616 So. 2d at 300 (quoting ***Smith v. State***, 550 So. 2d 406, 408 (Miss. 1989)) (emphasis added). Following re-indictment, Murray was not arrested until March 31, 2006. Between Murray's arrest on March 31, 2006, and the commencement of the jury trial on August 22, 2006, 144 days passed. As this delay is less than eight months, it is not "presumptively prejudicial[,]" *id*., and therefore, "there is no necessity for inquiry into the other factors that go into the balance." ***Barker***, 407 U.S. at 530. As such, this Court finds that the circuit court's denial of Murray's constitutional speedy-trial claim was supported by "substantial, credible evidence." ***DeLoach***, 722 So. 2d at 516.

13

**2.**

¶24.    Murray also asks this Court to analyze his speedy-trial claim using April 9, 2004, as the date of arrest.

*(1) Length of Delay*

¶25.    Between Murray's arrest on April 9, 2004, and the commencement of the jury trial on August 22, 2006, 865 days passed.  As this delay exceeds eight months by more than 600 days, it is deemed "presumptively prejudicial," and this factor favors Murray.  ***Noe***, 616 So. 2d at 300 (quoting ***Smith***, 550 So. 2d at 408).  Therefore, the remaining ***Barker*** factors will be analyzed.  *See **Herring***, 691 So. 2d at 955-56 (quoting ***State v. Ferguson***, 576 So. 2d 1252, 1254 (Miss. 1991)) ("[o]nce we find the delay presumptively prejudicial, the burden shifts to the [State] to produce evidence justifying the delay and to persuade the trier of fact of the legitimacy of the[se] reasons.").

*(2) Reason for the Delay*

¶26.    In ***Barker***, the United States Supreme Court stated:

> different weights should be assigned to different reasons. A *deliberate attempt* to delay the trial in order to hamper the defense should be *weighted heavily against the government*.  A more *neutral reason* such as negligence or overcrowded courts should be *weighted less heavily* but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.  Finally, a *valid reason*, such as a missing witness, should serve to *justify appropriate delay*.

***Barker***, 407 U.S. at 531 (emphasis added).  *See also **Jenkins v. State***, 607 So. 2d 1137, 1139 (Miss. 1992) (citations omitted) ("[w]here the defendant has not caused the delay and the State does not show good cause for that delay, this Court weighs this factor against the [State]. . . .  [A]ny delay unintentionally caused by the State will not be weighed as heavily

14

against the [State] as where the delay was intended to hurt the defendant's case."). Furthermore, this Court has stated that "[d]elays which are attributable to one party count against that party." ***Brengettcy v. State***, 794 So. 2d 987, 993 (Miss. 2001). Therefore, delays "attributable to the defendant tol[l] the running of time." ***Jenkins***, 607 So. 2d at 1138. *See also **Bailey v. State***, 463 So. 2d 1059, 1062 (Miss. 1985) ("if the defendant causes the delay he will not be allowed to complain.").

¶27.    Between Murray's arrest on April 9, 2004, and the State's first indictment on August 3, 2004, 116 days passed. As no evidence was presented that this time period could be attributed to either Murray or an intentional delay by the State, this Court will weigh it against the State. *See **Jenkins***, 607 So. 2d at 1139. Between Murray's first indictment on August 3, 2004, and the State's decision to *nolle prosequi* that indictment on February 22, 2005, 203 days passed. Once again, no evidence was presented that this time period could be attributed to either Murray or an intentional delay by the State, therefore, this Court will likewise weigh it against the State. *See **id**.* A mere ten days passed between the State's *nolle prosequi* on February 22, 2005, and its re-indictment of Murray on March 4, 2005. Even though Murray was aware of the State's intention to re-indict, it still weighs against the State, which controls both events. Between issuance of an arrest warrant for Murray on March 4, 2005, and his subsequent arrest in Jackson County on March 31, 2006, 392 days passed. This Court attributes this delay to Murray's absence from the jurisdiction, *see* Issue II.(A.) *supra*, and, therefore, does not count this period of delay against the State. *See **id**.* at 1138. Finally, between Murray's arrest in Jackson County on March 31, 2006, and commencement of the jury trial on August 22, 2006, 144 days passed. No evidence was presented that this

time period could be attributed to either Murray or an intentional delay by the State, therefore, this Court will weigh it against the State. In total, this Court finds that 473 days of the delay are attributable to the State, albeit with limited weight, given the absence of evidence indicating intentional delay. As that 473-day delay exceeds the "presumptively prejudicial" threshold of eight months, this Court finds this factor to favor Murray. *See Noe*, 616 So. 2d at 300.

*(3) Defendant's Assertion of His Right*

¶28. ***Barker*** provides that:

> [t]he defendant's *assertion of his speedy trial right*, then, is entitled to *strong evidentiary weight* in determining whether the defendant is being deprived of the right. We emphasize that *failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial*.

***Barker***, 407 U.S. at 531-32 (emphasis added). *See also **Atterberry***, 667 So. 2d at 627 (citations omitted) ("failure to assert a right to a speedy trial should be given 'strong evidentiary weight' in the ***Barker*** analysis."). While "[a]n accused has no duty to bring himself to trial[,] . . . [s]till he gains far more points under this prong of the ***Barker*** test where he has *demanded a speedy trial*." ***Perry v. State***, 637 So. 2d 871, 875 (Miss. 1994) (quoting ***Jaco v. State***, 574 So. 2d 625, 632 (Miss. 1990)) (emphasis added). This Court previously has distinguished the demand for dismissal for violation of the right to speedy trial from the demand for speedy trial. *See **Guice v. State***, 2007 Miss. LEXIS 9 at *32-33 (Miss. 2007); ***Brengettcy***, 794 So. 2d at 994; ***Perry***, 637 So. 2d at 875-76. Specifically, ***Perry*** states that:

> [i]n ***Adams*** [***v. State***, 583 So. 2d 165, 169-70 (Miss. 1991)] we observed that a demand for dismissal for violation of the right to speedy trial is *not* the equivalent of a demand for speedy trial. *Such a motion seeks discharge not trial*. There we held that a demand for dismissal coupled with a demand for

16

an instant trial was insufficient to weigh this factor in favor of the defendant, where *the motion came after the bulk of the entire period of delay had elapsed*. *Id*. Similarly, as the trial court observed, Perry never demanded trial; he demanded dismissal claiming that his speedy trial rights had already been violated. Although his June motion mentioned that trial was set for October, *an earlier trial date was not a part of the relief requested*, even in the alternative.

*Perry*, 637 So. 2d at 875-76 (emphasis added).

¶29. This Court finds Murray's "Motion to Dismiss for Lack of Speedy Trial" analogous to the motions filed by the defendants in *Adams* and *Perry*. Murray's motion was not filed until the vast majority of the delay period had elapsed. Specifically, 808 days had passed from the time of Murray's April 9, 2004, arrest to the filing of his motion, and the motion preceded the jury trial by only 57 days. Substantively, the June 26, 2006, motion was Murray's first speedy-trial-related motion. In that motion, Murray never sought an instant trial, but solely moved for dismissal. As "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial[,]" Murray's failure to make timely demand for a speedy trial leads this Court to find that this factor favors the State. *Barker*, 407 U.S. at 531-32.

*(4) Prejudice to the Defendant*

¶30. "The accused is not required to put forth an affirmative showing of prejudice to prove his right to a speedy trial was violated. Nevertheless *an absence of prejudice weighs against a finding of a violation*." *Atterberry*, 667 So. 2d at 627 (citation omitted) (emphasis added). Under the *Barker* test, prejudice "has two aspects: (1) actual prejudice to the accused in defending his case, and (2) interference with the defendant's liberty." *Brengettcy*, 794 So.

17

2d at 994 (citing *Perry*, 637 So. 2d at 876). In *Barker*, the United States Supreme Court

determined that:

> [p]rejudice . . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (I) to prevent oppressive pretrial incarceration; (II) to minimize anxiety and concern of the accused; and (III) to limit the possibility that the defense will be impaired. Of these, *the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system*. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

*Barker*, 407 U.S. at 532 (emphasis added). An evidentiary demonstration of prejudice is

necessary as this Court "will not infer prejudice to the defense out of the 'clear blue.'"

*Magnusen v. State*, 646 So. 2d 1275, 1285 (Miss. 1994).

¶31. Murray argues that he suffered prejudice from the delay because:

> [h]is initial bond was lost after the bonding company went out of business, so Murray had to pay another bond. As a result of [Murray's] absence from work, Murray was fired from his job. [Finally,] the State admitted [Murray's blood] evidence was destroyed during the delay and did not refute Murray's testimony regarding his employment[. As such,] this factor also weighs against the State.

The State responds that Murray's complaints about paying for another bond and losing his

job were personal and not prejudicial to his defense. Regarding Murray's blood evidence,

the State asserts:

> [t]he original blood vials were destroyed in keeping with standard laboratory practice. The record reflects that Murray and his counsel were given photocopies of the blood vials as well as the written results of the test. His counsel cross[-]examined the lab technician who testified that Murray's blood alcohol content was .22 per cent. In addition, in his own testimony, Murray admitted that he had been drinking from around 5:00 to around 11:00 to 12:00 P.M.

18

(Citations omitted).

¶32.    As a preliminary matter, this Court notes that Murray's prejudice argument is limited, as he makes no allegations of oppressive pretrial incarceration or anxiety. *See **Barker***, 407 U.S. at 532. This Court agrees with the circuit court that Murray's allegations of prejudice in being fired following his March 31, 2006, arrest and being required to pay for another bond because Griffith Bonding went out of business, in no way impaired Murray's defense. *See **Barker***, 407 U.S. at 532.

¶33.    As to disposal of Murray's blood specimens by the Mississippi Crime Laboratory, this Court concludes that the absence of this physical evidence is mitigated by eyewitness testimony[14] and the testimony of expert forensic toxicologist McIntire. Not only did McIntire vouch for the untampered nature of the blood specimens upon receipt, her subsequent examination determined that Murray had a 0.22% blood alcohol level. Additionally, she testified that disposal of the blood specimens was consistent with Mississippi Crime Laboratory policy. As such, this Court concludes that Murray's defense was not impaired by the disposal of the specimens. In total, this Court finds that "substantial, credible evidence" in the record supports the circuit court's conclusion that Murray failed to establish prejudice. ***DeLoach***, 722 So. 2d at 516. As the "absence of prejudice weighs against a finding of a violation[,]" this Court finds that this factor favors the State. ***Atterberry***, 667 So. 2d at 627.

---

[14]Including Murray, who never denied being intoxicated.

19

*Balancing Test*

¶34.  Assuming arguendo that the applicable date of arrest is April 9, 2004, a "presumptively prejudicial" 473-day period of the delay is attributable to the State. However, Murray's failure to make timely demand for a speedy trial or to establish any prejudice to his defense from the delay leads this Court to the same conclusion as in Issue I(B)(1).  Specifically, "substantial, credible evidence" supported the circuit court's denial of Murray's constitutional speedy-trial claim.  ***DeLoach***, 722 So. 2d at 516.

**II. Whether there was sufficient evidence to support Murray's conviction.**

¶35.  Murray maintains that he "never denied being intoxicated; however, he did deny driving the truck."  Murray and Carr testified that Peanut was driving the truck and "[t]he State was not able to provide any conclusive evidence that [he] was driving the truck when it ran off the road and hit a tree[,]" Murray argues that the circuit court should have granted his motion for directed verdict.  The State responds that "[i]t was reasonable to infer from Falvey, Deputy Cole and [Deputy] Chandler's testimony about what they saw before and after the accident that Murray was driving the truck."  Furthermore, Ervin testified that she was sure that Peanut was at home with her the night of the wreck and took a call from the hospital about Murray being in a wreck.  Taking this evidence "as true with reasonable inferences," the State asserts that "there was more than sufficient, credible . . . corroborated evidence in support of the jury's verdict."

¶36.  As Murray made three separate motions for directed verdict and "each requires consideration of the evidence before the court when made, this Court properly reviews the

ruling on the last occasion the challenge was made in the trial court." ***McClain v. State***, 625

So. 2d 774, 778 (Miss. 1993). This Court previously has stated that:

> [i]n judging the sufficiency of the evidence on a motion for a directed verdict
> . . . the trial judge is required to *accept as true all of the evidence that is
> favorable to the State, including all reasonable inferences that may be drawn
> therefrom*, and to disregard evidence favorable to the defendant. *If*, under this
> standard, *sufficient evidence to support the jury's verdict of guilty exists, the
> motion for a directed verdict . . . should be overruled*.

***Noe v. State***, 616 So. 2d 298, 302 (Miss. 1993) (citations omitted) (emphasis added).

¶37. Mississippi Code Annotated Section 63-11-30(1) provides, in part, that:

> [i]t is unlawful for any person *to drive or otherwise operate* a vehicle within
> this state who (a) is under the influence of intoxicating liquor; (b) is under the
> influence of any other substance which has impaired such person's ability to
> operate a motor vehicle; (c) has an alcohol concentration of eight one-
> hundredths percent (.08%) or more for persons who are above the legal age to
> purchase alcoholic beverages under state law . . . .

Miss. Code Ann. § 63-11-30(1) (Rev. 2004) (emphasis added). Regarding the relevant

penalty, Mississippi Code Annotated Section 63-11-30(2)(c) states, in part, that:

> for any *third or subsequent conviction* of any person violating subsection (1)
> of this section, the offenses being committed *within a period of five (5) years*,
> such person shall be guilty of a felony and fined not less than Two Thousand
> Dollars ($2,000.00) nor more than Five Thousand Dollars ($5,000.00), shall
> serve *not less than one (1) year nor more than five (5) years* in the custody of
> the Department of Corrections . . . .

Miss. Code Ann. § 63-11-30(2)(c) (Rev. 2004) (emphasis added). As Murray concedes being

intoxicated, the only issue is whether sufficient evidence was presented that he was

"driv[ing] or otherwise operat[ing]" the truck.[15] Miss. Code Ann. § 63-11-30(1) (Rev. 2004).

---

[15]Murray does not dispute that this would be his third or subsequent offense within
a period of five years under Mississippi Code Annotated Section 63-11-30(1), thereby
rendering the penalty provisions of Mississippi Code Annotated Section 63-11-30(2)(c)

¶38. "When there is other sufficient evidence of impaired operation, no eyewitness testimony of impaired operation is needed to sustain a conviction." *Turner v. State*, 910 So. 2d 598, 601 (Miss. Ct. App. 2005) (citing *Holloway v. State*, 860 So. 2d 1244, 1246-47 (Miss. Ct. App. 2003)).  As in *Turner*, we conclude that "there was sufficient credible evidence from which it could be reasonably inferred" that Murray was operating the truck at the time of the accident. *Turner*, 910 So. 2d at 601.  First, Murray's claim that Peanut was driving the truck conflicts with the testimony of Peanut's wife, Ervin, who testified that Peanut was home with her during the entire evening of April 9, 2004, and was in no way involved in the accident.  Next, when driving within four car lengths of the truck before the accident, Falvey observed only one individual inside.  Upon arriving at the scene, Falvey testified that Murray was the only individual present.  Furthermore, according to Falvey, Murray admitted that he was the driver of the truck at the scene.  Both Deputies Cole and Chandler concluded that Murray was driving under the influence, based upon Falvey's statement, the absence of any other occupants at the scene, the presence of scattered open beer cans, and the distinct scent of alcohol on Murray's breath.  Finally, Deputy Chandler testified that Murray admitted to driving the truck later that evening at the jail. "[A]ccept[ing] as true all of the evidence that is favorable to the State, including all reasonable inferences that may be drawn therefrom," this Court finds that there was "sufficient evidence" to support the jury's verdict that Murray was driving or otherwise operating the truck, in finding him guilty of felonious operation of a motor vehicle while

applicable.

22

under the influence of intoxicating liquor. *Noe*, 616 So. 2d at 302. Accordingly, this Court will not disturb the jury's verdict and finds that the circuit court did not err in denying Murray's motion for directed verdict.

## CONCLUSION

¶39. Based upon the aforementioned analysis, this Court affirms the final judgment and sentence of the Circuit Court of Lincoln County as to Murray.

¶40. **CONVICTION OF FELONIOUS OPERATION OF A MOTOR VEHICLE WHILE UNDER THE INFLUENCE OF INTOXICATING LIQUOR AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THIS SENTENCE WILL BE SERVED DAY FOR DAY WITHOUT CHANCE OF EARLY RELEASE OR PAROLE.**

**SMITH, C.J., WALLER, P.J., EASLEY, CARLSON, DICKINSON AND LAMAR, JJ., CONCUR. DIAZ, P.J., AND GRAVES, J., CONCUR IN RESULT ONLY.**